No. 2--05--0616                                              filed: 3/15/06

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| JEFFREY S. LYNCH, | ) | Appeal from the Circuit Court |
| | ) | of Lake County. |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | No. 04--MR--1373 |
| | ) | |
| THE CITY OF WAUKEGAN, | ) | |
| PATRICK GALLAGHER, Fire Chief for the | ) | |
| City of Waukegan, THE WAUKEGAN CIVIL | ) | |
| SERVICE COMMISSION, HERB | ) | |
| KAUFMAN, WALSTONE FRANCIS, and | ) | |
| KERRY BIEGAY, Commissioners of the | ) | |
| Waukegan Civil Service Commission, and | ) | |
| JOHN DELLAVALLE, Secretary of the | ) | |
| Waukegan Civil Service Commission, | ) | Honorable |
| | ) | Raymond J. McKoski, |
| Defendants-Appellees. | ) | Judge, Presiding. |

JUSTICE O'MALLEY delivered the opinion of the court:

Plaintiff, Jeffrey S. Lynch, appeals the judgment of the circuit court of Lake County affirming the decision of defendant, the Waukegan Civil Service Commission (Commission), discharging plaintiff for cause from his job as a firefighter for defendant, the City of Waukegan (City). We reverse and remand for further proceedings.

BACKGROUND

Plaintiff began his employment as a firefighter for the City in 1985 and was promoted to the rank of lieutenant in 1994. In July 2004, the City, through defendant Fire Chief Patrick Gallagher, filed disciplinary charges with the Commission, seeking plaintiff's discharge from his employment

as a firefighter. Gallagher brought the following seven charges: (1) plaintiff violated Commission rules requiring firefighters to maintain good physical condition; (2) plaintiff violated Commission rules requiring civil servants to perform the duties assigned to them; (3) plaintiff was medically unable to comply with rules of the City's fire department requiring firefighters to perform the duties assigned to them and to promote their physical and mental welfare; (4) plaintiff was absent without leave according to the rules of the City's fire department in that he exhausted all sick time and vacation time and still failed to appear for work; (5) plaintiff violated Commission rules (different from the rules on which charge number two is based) requiring him to be physically fit; (6) plaintiff failed to comply with Commission rules (different from the rules on which charge number two is based) requiring him to perform the duties assigned to him; and (7) plaintiff failed to obtain advance permission from the fire chief to secure outside employment as required by Commission rules.

On August 12, 2004, plaintiff applied for a disability pension. The hearing on the disciplinary charges commenced November 5, 2004.

Defendants' first witness was Patrick Gallagher, fire chief for the City. Gallagher testified that he is responsible for personnel and human resource issues within the fire department. Gallagher testified that, in 2001, plaintiff began to have problems fulfilling his duties as a firefighter. Gallagher testified that on September 17, 2001, Battalion Chief Dan Simmett informed him that plaintiff had become "upset and agitated" earlier that day during a training session and that an ambulance was called. Simmett told Gallagher that plaintiff resisted going to the hospital and that five firefighters were required to get him into the ambulance. The City introduced into evidence a hospital discharge form attesting to plaintiff's September 17, 2001, hospital visit and ordering that he

not work until October 1, 2001. The City also introduced into evidence an October 1, 2001, report from psychiatrist Steven Lammers describing his session with plaintiff and diagnosing him with a "panic disorder."

Gallagher testified that plaintiff returned to work on October 1, 2001, but on restricted duty. The City introduced into evidence a report of a meeting between Gallagher and plaintiff that occurred on October 1, 2001. The report states:

"[Plaintiff] stated he felt ready to return to work but that a part of him was not shure [sic]. He wanted to return but was not shure [sic] he could be 100 %. He also stated that this a.m. he had an episode similar to the one of 9/17/01 and he had to go and lie down until it passed. [Plaintiff] stated that if that would happen when he was at work he would need to go home or be allowed to lie down for a while."

Gallagher testified that, pursuant to the recommendations of a physician, plaintiff was returned to full duty on January 14, 2002. The City introduced into evidence a February 18, 2002, report from Dr. Daram Reddy, who had evaluated plaintiff to determine his fitness for work. In the report, Dr. Reddy states:

"I spoke to [plaintiff,] who gave information spontaneously and was very open in his interaction. He reflected that he had one panic attack on September 17th while involved in office work, but not while he is [sic] on a fire call. Since then he didn't have any more panic attacks. The medication he is taking now, namely Zoloft, has been very effective. He indicated he has had minor episodes of anxious feelings which he was able to deal with easily. He indicated that if he has a panic attack while he is on a fire call he has the

commitment and ability as a professional to focus and complete the task he is engaged in at the time."

Dr. Reddy opined that plaintiff was capable of performing his full duties as a firefighter.

The City then introduced into evidence a multipage document entitled "2002 Absentee Calender." Gallagher described the document as a record of plaintiff's attendance for 2002 as maintained by his supervisors, who report "his attendance as well as any accommodations, positive performance, any concerns with his performance or significant events regarding his duties as a lieutenant on the Fire Department." Gallagher testified that each of the City's firefighters has such a log. Gallagher then identified an entry from April 11, 2002, in which a Lieutenant Christensen recorded that plaintiff was attending poorly to his duties.

Gallagher testified that in August 2003 then-Captain John Schmidt and Lieutenant Chief John DiNicola informed him of an incident involving plaintiff and a firefighter named Al Ramos. Gallagher testified to what Schmidt and DiNicola told him about the incident. Gallagher testified that on August 13, 2003, plaintiff and Ramos, a probationary firefighter, responded to a fire at an apartment. Plaintiff commanded Ramos to enter the fiery apartment despite Ramos's repeated protests that he did not have an adequate water supply for his hose. Ramos ultimately complied with plaintiff's order and was burned as a result. Gallagher testified that it is standard procedure for a firefighter to insure that there is an adequate water supply before advancing into a fiery area. The City introduced into evidence an August 13, 2003, report of a meeting between plaintiff, DiNicola, and Schmidt concerning the incident. According to the report, plaintiff directed Ramos to advance into the fire "without a secured water supply." DiNicola and Schmidt considered plaintiff at fault for

failing "to identify his water supply problems" and expressed concerns with plaintiff's "basic fire officer skills" and his "ability to do a safe and positive risk analysis before and during his size-up of [a] fire." The trial court also admitted into evidence a document containing plaintiff's own account of the incident. Plaintiff recounted that as he and Ramos approached the door of the apartment, their water supply "was temporarily lost." They retreated several feet, but Ramos received burns because he was closer to the fire.

Gallagher testified that on September 15, 2003, he and plaintiff responded to the scene of a traffic accident. Plaintiff's fire engine was parked on an incline. According to Gallagher, it is standard procedure for City firefighters to secure the wheels of fire engines parked on inclines to prevent them from rolling away if the brakes fail. When, at Gallagher's directive, plaintiff went to secure the wheels on his engine, he could not find the necessary wheel restraints on the engine, even though they were in their customary place. Gallagher testified that this incident caused Schmidt to relieve plaintiff of his duties that day. The City introduced into evidence a memorandum from Schmidt to DiNicola, describing the aftermath of the September 15, 2003, incident. In the memorandum, Schmidt writes:

> "[P]laintiff had just returned from the *** call. I asked [plaintiff] how things went on the call. He replied 'okay.' I then asked him directly how he was doing and he replied 'Not [s]o [w]ell.' I asked him what's wrong, what [sic] going on. He stated that he was unable to function well at the call, he was unable to follow simple operations such as finding an item on the engine. I asked him if he was having difficulties with the order of operations. He stated yes. He feels very unsure of himself when in these types of situations. At this time I

alerted [DiNicola] and he went and found [plaintiff] and brought him into [his] office. All three of us discussed this situation and then decided to relieve [plaintiff] of his duties for the remainder of his shift.

　　[Plaintiff] was instructed to call his Doctors [sic] to schedule an evaluation.

　　[Plaintiff] was told to call [DiNicola] or myself before his next duty shift.

　　Chief Gallagher was advised of the situation."

The City also introduced into evidence a memorandum from DiNicola to Gallagher dated September 15, 2003. The memorandum contains DiNicola's recollection of his meeting with plaintiff and Schmidt. DiNicola writes:

"When I asked [plaintiff] what the problem was he stated he had trouble making decisions at the call he was just at and could not decide in what order things were to be done. He also said he has been having more trouble making decisions. *** He stated he is often confused at work and does not know what needs to be done or what order to accomplish tasks. I asked if he felt he should go home at this time for his safety and the safety of his crew. He stated he did not want to but it was probably best for all if he did. He was also told to call his doctor to further discuss the matter.

　　*** [P]laintiff was told the Fire Chief would be advised of our conversation. [Plaintiff] went home at 1900 hrs for the remainder of his shift."

Gallagher testified that plaintiff was placed on leave on September 15, 2003, because he was unfit to perform his duties. Gallagher testified that plaintiff has not obtained medical clearance to return to work since that day and remains on leave. Gallagher further noted that on one occasion

since September 15, 2003, plaintiff indicated that he did not feel he could ever return to his duties as a firefighter. Gallagher testified that plaintiff has given no further indication of his condition and has not responded to Gallagher's requests for medical updates. Gallagher testified that he has advised plaintiff that if he could not return to his duties as a firefighter, he would have to resign or Gallagher would file for his dismissal. Gallagher offered to allow plaintiff to resign to avoid dismissal, but plaintiff chose not to resign. Gallagher testified that plaintiff has exhausted all of his vacation and sick time but has not returned to work, in violation of Commission rules. Gallagher testified that another firefighter was promoted to fill the lieutenant vacancy created by plaintiff's absence but that no one has been hired to fill the void created by that promotion. Gallagher explained that, when plaintiff went on leave, the fire department was staffed at the maximum permitted by ordinance, requiring that Gallagher go through administrative channels to obtain a replacement for plaintiff. (Gallagher explained that the staffing maximum has since been raised to 113 but did not specify when that occurred.) Gallagher testified that the department has had to rely on the overtime work of current firefighters to compensate for plaintiff's absence. The City introduced into evidence a document that Gallagher identified as a "manpower study" prepared by his department. The study calculated that the department spent $64,000 in overtime wages between October 17, 2003, the date plaintiff was replaced as lieutenant, and August 21, 2004. Gallagher further testified that, in violation of Commission rules, plaintiff obtained outside employment while on leave without first asking Gallagher for permission.

On cross-examination, Gallagher testified that he did not witness the September 17, 2001, panic attack that led to plaintiff's hospitalization. Gallagher testified that he was at the scene of the

injury to firefighter Al Ramos but was outside the apartment building and therefore did not witness plaintiff order Ramos to advance into the fire. Plaintiff introduced into evidence a report from Dr. Reddy dated February 25, 2004, which Gallagher acknowledged receiving. In the report, Dr. Reddy states in relevant part:

"[Plaintiff] has consulted me on September 22, 2003 and presented with complaints of a panic attack on September 15, 2003. *** He has been having difficulty with memory, concentration and organization at work. He has found himself making minor mistakes. He has received treatment with Paxil CR 25 mg with good relief of anxiety symptoms. He is no longer experiencing panic attacks. *** I recommended that he be allowed to return to work to involve administrative duties and not to be involved in the line of duty. He experienced panic attacks and a decrease in his concentration due to work related stress.

If you can not accommodate his needs under [the] Americans for [sic] Disabilities Act he should be allowed to retire on [m]edical [d]isability with benefits as he deserves, per your rules."

John Schmidt, battalion chief of the City's fire department, testified that he was formerly a captain in the department and in that capacity was plaintiff's immediate supervisor from 2001 through 2003. During this period Schmidt reported to Chief Gallagher "things that were out of the ordinary that [plaintiff] was doing." Schmidt testified that, on March 14, 2003, he told plaintiff to take a training tape to one of the fire stations. Plaintiff did not take the tape. When Schmidt asked plaintiff why he had not delivered the tape, plaintiff replied that he did not remember Schmidt telling

him to deliver the tape. Also on March 14, 2003, plaintiff forgot to turn in one of his reports. Plaintiff told Schmidt that he had sat down to write the report but then entirely forgot about it.

Schmidt testified that he was standing 8 or 10 feet behind plaintiff when Ramos was burned on August 13, 2003. Schmidt noticed that plaintiff and Ramos had not used their hose. During his investigation of the incident, Schmidt learned from Ramos that plaintiff had ordered him to advance into the fire despite his repeated protests that he had no water supply. Schmidt concluded that Ramos and plaintiff had an adequate water supply before going into the building but lost it at some point later. Plaintiff suggested to Schmidt that the loss of the water supply might have been the result of a kink in the hose. Schmidt testified that he never determined what caused the loss of the water supply that day.

Schmidt also testified regarding the incident of September 15, 2003, where plaintiff could not find the wheel restraints for his engine. Schmidt testified that he encountered plaintiff after the incident. Plaintiff "didn't seem himself." Schmidt felt there was something "definitely wrong" with plaintiff. When Schmidt asked him how the call had gone, plaintiff said "okay." Plaintiff seemed "very despondent." At that point, Schmidt decided that plaintiff should be relieved of his duties. Plaintiff did not dispute the decision. Schmidt testified that, from 2001 through 2003, he had witnessed a change in plaintiff's demeanor and performance and saw his effectiveness as a firefighter diminish.

After Schmidt testified, the City rested its case. Plaintiff presented no evidence. The Commission then decided to ask its own questions of plaintiff. Plaintiff testified that he secured outside employment after he received his last paycheck from the City in March 2004. Plaintiff

admitted that he did not seek permission from Gallagher before obtaining that employment. Plaintiff further acknowledged that, just two days before the hearing on the disciplinary charges, plaintiff wrote a letter to Gallagher, seeking "retroactive" permission for the employment.

Plaintiff introduced into evidence a report from Dr. Reddy dated August 25, 2004. In the report, Dr. Reddy states:

> "[Plaintiff] has been re-evaluated on August 23, 2004. He reported no [p]anic [a]ttacks, as he is no longer working in a stressful situation. He has not been taking any Paxil for [p]anic [a]ttacks since November 2003 per my advice but he continues to take [Strattera] 60 mg a day which helps his concentration. He is managing to work two part time jobs where he experiences no stress. He is continued on Strattera 60 mg per day.
> He will be seen again by me in two months."

Plaintiff testified that, after being relieved of his duties in September 2003, he communicated only infrequently with Gallagher. Gallagher asked plaintiff whether he intended to return to work and plaintiff replied that he was not sure. Plaintiff later informed Gallagher that Dr. Reddy had released plaintiff to "light duty office work." Asked by one of the Commissioners if he had any plans to return to work, plaintiff answered:

> "I was hoping to be given some time. Just to give you the whole story, I went home at the suggestion of Schmidt with safety issues, safety of everything. Reluctantly I was hoping I would just have a little bite [sic] in [sic] time, light duty like I did before and workmen's comp, but it just didn't pan out."

No. 2--05--0616

Plaintiff testified that he exhausted his federal leave time and, though he could have filed for additional leave, he thought, "[W]hy bother?"

At the close of the evidence, plaintiff asked the Commission to place him on an unpaid leave of absence. The Commission found that the City proved charges three, four, five, and seven. On November 5, 2004, the Commission ordered that plaintiff be discharged for cause from service as a firefighter. Plaintiff filed a complaint for administrative review in the trial court. The trial court affirmed the decision of the Commission. Plaintiff filed his notice of appeal on June 16, 2005.

ANALYSIS

In reviewing a final administrative decision under the Administrative Review Law (735 ILCS 5/3--101 et seq. (West 2002)), our role is to review the administrative decision, not the trial court's determination. Du Page County Airport Authority v. Department of Revenue, 358 Ill. App. 3d 476, 481 (2005). The standard of review applicable to an agency's decision depends on the type of question presented. AFM Messenger Service, Inc. v. Department of Employment Security, 198 Ill. 2d 380, 390 (2001). An agency's findings of fact will be upheld unless against the manifest weight of the evidence, i.e., unless the opposite conclusion is clearly evident. Du Page County Airport Authority, 358 Ill. App. 3d at 482. On the other hand, an agency's rulings on questions of law are reviewed de novo. City of Belvidere v. Illinois State Labor Relations Board, 181 Ill. 2d 191, 205 (1998). Mixed questions of law and fact, in which the facts and law are undisputed and the only issue is whether the facts satisfy the settled statutory standard, receive review under the clearly-erroneous standard. Du Page County Airport Authority, 358 Ill. App. 3d at 482.

Plaintiff argues that (1) the Commission erred in adjudicating the disciplinary charges against him while his claim for a disability pension was pending; (2) the Commission erroneously admitted hearsay; (3) the Commission wrongfully called plaintiff as a witness; (4) the City failed to prove the charges against plaintiff; and (5) the Commission's decision to discharge plaintiff was erroneous under Walsh v. Board of Fire & Police Commissioners, 96 Ill. 2d 101 (1983), because the discharge threatens plaintiff's disability pension. The last argument is dispositive, so we address it first. The issue of how plaintiff's discharge will affect his pension rights is a question of law that we review de novo. City of Belvidere, 181 Ill. 2d at 205.

First, we note that plaintiff has appended to his appellant's brief a copy of a June 3, 2005, decision of the City's pension board granting him a duty-related disability pension under section 4--110 of the Pension Code (40 ILCS 5/4--110 (2002)). We take judicial notice of that decision. See Colvett v. L. Karp & Sons, Inc., 211 Ill. App. 3d 731, 734 (1991) (a court may take notice of a prior administrative decision).

Plaintiff argued before the Commission that the disciplinary proceedings should be continued until the pension matter was resolved. The Commission refused to grant a continuance. We need not decide whether the continuance should have been granted, because the pension board's subsequent award of a disability pension to plaintiff changes the complexion of this case and brings it fully under the sway of Walsh. The plaintiff in Walsh was a police officer who was diagnosed with psychiatric problems and consequently placed on a medical-disability suspension and given a disability pension. Although removed from active duty, the plaintiff was permitted to retain his rank, uniform, badge, and service revolver. Several months later, the plaintiff held his wife and a

fellow officer at gunpoint, threatened to kill himself, and accidentally shot the officer. The chief of police brought a disciplinary action, charging the plaintiff with reckless conduct and aggravated assault. The board of fire and police commissioners ordered that the plaintiff be discharged. On appeal to the supreme court, the plaintiff argued for reversal, urging that it was "arbitrary and unreasonable to grant a medical suspension and disability pension when an officer has psychiatric problems and later discharge him and take away his pension when the same psychiatric condition causes him to act in a manner that warrants discharge." Walsh, 96 Ill. 2d at 107. The supreme court noted that, though it was evident from the record that the plaintiff had a psychiatric problem, there was no evidence of the specific nature of the problem and it was unclear whether the shooting incident had any relation to the problem. Walsh, 96 Ill. 2d at 107. The supreme court reversed the board's decision out of concern for the plaintiff's pension rights:

"[B]ecause the psychiatric evidence presented was so vague and because the board's decision to discharge [the plaintiff] for cause may jeopardize his pension rights, we believe that justice and fairness require us to vacate the judgments of the appellate and circuit courts and the order of the board and remand this cause to the board for the submission by either party of further evidence that is relevant to the issue of whether [the plaintiff's] misconduct was substantially the result of the psychiatric problems that led to his prior medical suspension. If the board finds that the misconduct was substantially related to those problems, the proper sanction would be other than discharge for 'cause.' " Walsh, 96 Ill. 2d at 108.

The supreme court in Walsh does not identify in what way the plaintiff's discharge might have affected his pension or explain why the vagueness of the testimony about the plaintiff's

˘13˘

psychiatric condition warranted reversal rather than affirmance. We are, nonetheless, bound by Walsh and hold that it precludes the Commission from discharging plaintiff for cause based on misconduct that is "substantially related" to the psychiatric problems that formed the basis for his pension. Here, in contrast to Walsh, the evidence relating to the connection between plaintiff's misconduct and the grounds for his pension is not vague but is in fact suitable for review.

We begin by comparing the grounds for plaintiff's discharge with the grounds for his pension. The Commission did not provide any express factual findings to support its decision to discharge plaintiff, but we may infer its findings from what was charged. The Commission found that the City had proven the following charges: (3) plaintiff was medically unable to comply with the City's rules requiring each firefighter to perform the duties assigned to him and to promote his physical and mental welfare; (4) plaintiff was absent without leave as defined by the City's rules in that he exhausted all sick and vacation time and still failed to appear for work; (5) plaintiff failed to comply with Commission rules requiring him to perform the work duties assigned to him; and (7) plaintiff failed to obtain permission to secure outside employment as required by Commission rules. Gallagher himself provided no specifics in the charges but generally alleged that plaintiff's "medical condition prevents him from performing his duties as a firefighter" and that he has had "documented difficulties at work which have included actions that endangered the safety of [plaintiff] and the personnel under his command." Gallagher further noted that plaintiff used all of his "accrued benefits for paid and unpaid time off" without returning to work and also did not seek Gallagher's permission before obtaining outside employment. Gallagher attached to his complaint the documents that were later admitted as the City's exhibits. These documents contain physicians'

reports about plaintiff's mental condition and describe various work-related incidents such as plaintiff's panic attack on September 17, 2001, the August 13, 2003, fire call where firefighter Ramos was burned, and plaintiff's memory lapses at the accident scene on September 15, 2003, which was his last day on duty. We may assume that the Commission generally credited the City's evidence and considered dismissal an appropriate sanction given plaintiff's lapses during the execution of his duties, his failure to return to work after exhausting his paid and unpaid time off, and his obtaining employment without seeking Gallagher's permission.

The pension board's findings of fact also recite the incidents of September 17, 2001, August 13, 2003, and September 15, 2003. The findings of fact further relate that the physicians appointed by the pension board diagnosed plaintiff with a cognitive disorder that impairs his ability to process information and make decisions, especially in stressful or complex situations. Two other physicians diagnosed plaintiff with a panic disorder. The physicians all agreed that plaintiff's disorders preexisted his employment as a firefighter and perhaps were even lifelong. Several of the physicians opined that plaintiff's condition was worsened by his employment as a firefighter. Based on these findings, the pension board determined that "[a]lthough [plaintiff] suffered from a pre-existing condition, a series of acts of firefighting duties and the duties of a fire lieutenant aggravated his underlying condition, and thus contributed to his disability."

The decisions of the pension board and the Commission were both based on the incidents of September 17, 2001, August 13, 2003, and September 15, 2003. To the Commission these were instances of misconduct warranting plaintiff's discharge. To the pension board, these instances were brought about by plaintiff's cognitive disorder. Under Walsh, a firefighter cannot be discharged for

misconduct that is substantially related to the psychiatric condition that was the basis for his pension award. Therefore, the incidents of September 17, 2001, August 13, 2003, and September 15, 2003, cannot serve as grounds for plaintiff's discharge.

We recognize, of course, that the decisions of the Commission and the pension board did not have identical grounds. The Commission based its decision not only on plaintiff's performance during work but also on his failure to report to work after his paid and unpaid time off expired and on his procurement of outside employment without first seeking Gallagher's consent. These circumstances may, nonetheless, be attributable to plaintiff's cognitive disorder, which impairs his decision-making process. Plaintiff's failure to seek Gallagher's consent prior to obtaining outside employment may have been the effect of a memory lapse of the kind that plaintiff had suffered previously. And there is no question that plaintiff's absence from work was due to his impairment. After going on leave in September 2003, plaintiff told Gallagher that he did not believe he could ever return to work as a firefighter. The City, of course, suggests that plaintiff simply should have resigned after his vacation and sick time expired. Resignation, however, would have precluded plaintiff from later seeking disability benefits. See Di Falco v. Board of Trustees of the Firemen's Pension Fund of the Wood Dale Fire Protection District No. One, 122 Ill. 2d 22, 30 (1988) (interpreting provisions of the firefighter's pension code as requiring that an applicant be employed as a firefighter at the time he seeks disability benefits). Walsh instructs us to be solicitous of the rights of a pensioner in instances like this. Plaintiff, it is true, did not explain why he waited to file for disability benefits until August 2004, a year after he was placed on leave. Certainly, though, he was hopeful of returning to work at least on light duty. While on leave he continued to seek

˘16˘

No. 2--05--0616

treatment from Dr. Reddy for the ongoing cognitive disorder. In his reports of February and August 2004, Dr. Reddy noted that plaintiff was no longer experiencing panic attacks and recommended that plaintiff be given light duty by the fire department. Gallagher acknowledged receiving Dr. Reddy's reports but did not indicate whether the fire department made any effort to accommodate plaintiff's needs as it had in October 2001 when plaintiff returned from his first leave.

However, it is ultimately irrelevant whether plaintiff's cognitive disorder was responsible for his absence from work after his paid and unpaid time off expired and for his failure to obtain permission before procuring outside employment. The Commission found certain of the City's charges proved and determined that they collectively warranted discharge. Thus, the Commission did not find whether the foregoing conduct provided an independent basis for discharge. A remand is unnecessary, however, because even if that conduct is unattributable to plaintiff's cognitive disorder, it would not be sufficient in itself to justify discharge. "Cause" for discharge is defined as some substantial shortcoming that renders the employee's continuance in his office or employment in some way detrimental to the discipline and efficiency of the service and that the law and sound public opinion recognize as good cause for his no longer holding the position. Sangirardi v. Village of Stickney, 342 Ill. App. 3d 1, 17-18 (2003). Reviewing courts have reversed discharges based on conduct demonstrably more inimical than the conduct at hand. See Massingale v. Police Board, 140 Ill. App. 3d 378, 382 (1986) (holding that discharge of police officer for driving off-duty while intoxicated was too severe in light of her years of service); Kirsch v. Rochford, 55 Ill. App. 3d 1042, 1046 (1977) (holding that discharge based on police officer's off-duty public intoxication and refusal to obey a directive from his superior officer to take a Breathalyzer test was too severe given

his years of service). Here, plaintiff's continued absence from work after he exhausted his paid and unpaid time off was accompanied by such mitigating circumstances that we cannot say it constituted a substantial shortcoming that rendered plaintiff's continuation in employment detrimental to the functioning of the fire department.

Gallagher sought to justify the discharge on fiscal grounds, claiming that the manpower void caused by plaintiff's absence forced the City to pay for additional overtime due to staffing limits. Gallagher admitted, however, that he could have sought to increase those limits through administrative channels. As for plaintiff's violation of the rule requiring him to seek permission from the fire chief before obtaining outside employment, that rule bears little more than a tangential relation to the requirements of a firefighter's service. See Kreiser v. Police Board, 69 Ill. 2d 27, 31 (1977) (police officer's infractions, which included leaving the station without properly signing out, then driving an unlicensed personal car and thereafter lying about the entire incident to a superior officer, were not sufficiently related to the performance of the officer's duties as to warrant discharge). Plaintiff has been a firefighter for over 20 years. His immediate supervisor, Schmidt, testified that he was a "very effective" firefighter before his recent decline. There was no evidence of any other infractions in plaintiff's employment history prior to the conduct that gave rise to the charges in this case. We hold, therefore, that the foregoing conduct cannot in itself justify plaintiff's discharge.

In Walsh, the supreme court reversed the board's decision and remanded for further proceedings, observing that, if the evidence revealed no grounds for discipline independent of the misconduct caused by the plaintiff's psychiatric disorder, then discharge for cause would be an

inappropriate discipline and some lesser sanction should be imposed instead. Here there are no adequate grounds for plaintiff's discharge independent of the cognitive disorder upon which his pension was based. Therefore, the Commission's decision to discharge plaintiff for cause is clearly erroneous, and we reverse it. Consistent with Walsh, we remand for further proceedings to determine whether a lesser sanction might be appropriate, though we express no opinion on what that sanction might be, given that plaintiff is now on a disability pension.

Having found this issue dispositive, we not address the remainder of plaintiff's arguments.

CONCLUSION

For the foregoing reasons, we reverse the circuit court's affirmance of the Commission's decision discharging plaintiff for cause and remand this cause for further proceedings consistent with this disposition.

Reversed and remanded for further proceedings.

BOWMAN and GILLERAN JOHNSON, JJ., concur.