# ILLINOIS OFFICIAL REPORTS

## Appellate Court

*Gorski v. Board of Fire & Police Commissioners of the City of Woodstock*, 2011 IL App (2d) 100808

| | |
|---|---|
| Appellate Court Caption | STEVEN GORSKI, Plaintiff-Appellant, v. THE BOARD OF FIRE AND POLICE COMMISSIONERS OF THE CITY OF WOODSTOCK; RONALD GIORDANO; LAWRENCE HOWELL; THOMAS SCHROEDER; ROBERT LOWEN, Police Chief; and THE CITY OF WOODSTOCK, Defendants-Appellees. |
| District & No. | Second District<br>Docket No. 2-10-0808 |
| Filed | December 22, 2011 |
| Rehearing denied | February 24, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The trial court's order affirming the termination of plaintiff police officer by the board of fire and police commissioners for violating department rules and regulations and his overlapping use and abuse of prescription narcotic drugs was affirmed by the appellate court where plaintiff forfeited his argument that the trial court applied the wrong standard by failing to provide support for the argument in compliance with Supreme Court Rule 341, and even assuming the argument was not forfeited, plaintiff never presented sufficient evidence to refute the *prima facie* case showing a basis for his termination. |
| Decision Under Review | Appeal from the Circuit Court of McHenry County, Nos. 08-MR-60, 09-MR-304; the Hon. Maureen P. McIntyre and the Hon. Thomas A. Meyer, Judges, presiding. |

| | |
|---|---|
| Judgment | Affirmed. |
| Counsel on Appeal | Thomas W. Duda, of Law Offices of Thomas W. Duda, of Arlington Heights, for appellant. |
| | Jennifer J. Gibson, of Zukowski, Rogers, Flood & McArdle, of Crystal Lake, for appellees. |
| Panel | JUSTICE McLAREN delivered the judgment of the court, with opinion. Presiding Justice Jorgensen and Justice Bowman concurred in the judgment and opinion. |

**OPINION**

¶ 1    Plaintiff, Woodstock police sergeant Steven Gorski, appeals the circuit court's orders reversing defendant the Board of Fire and Police Commissioners of Woodstock's (Board) grant of a directed finding in Gorski's favor and subsequently affirming the Board's termination of Gorski. On appeal, Gorski argues that (1) the Board's grant of a directed finding in his favor was not against the manifest weight of the evidence; (2) the Board's ultimate decision to terminate him was improper because his line-of-duty disability pension was pending; and (3) this court should not be bound by the circuit court's decision affirming the Board's decision to terminate, because the Board's two decisions are conflicting. We affirm.

¶ 2                                I. BACKGROUND

¶ 3    On August 29, 2007, Woodstock police chief Robert Lowen filed a complaint with the Board against Gorski. The complaint sought Gorski's discharge from the Woodstock police department (police department), alleging that Gorski's conduct constituted cause for discharge, as required by section 10-2.1-17 of the Illinois Municipal Code (Municipal Code) (65 ILCS 5/10-2.1-17 (West 2006)), because he violated police department rules and regulations, a return-to-work agreement, an agreement with the Illinois Pain Institute, and an agreement regarding his treatment with Suboxone and because of "his overall pattern of overlapping use and abuse of prescription narcotic drugs."

¶ 4    On February 4, 2008, the matter proceeded to a hearing before the Board. Chief Lowen testified that on February 13, 2006, he met with Gorski and told him that he was concerned that Gorski was abusing prescription drugs. Chief Lowen told Gorski that it was not appropriate to take Vicodin while performing his duties as a sworn police officer. He referred

Gorski to the employee assistance program.

¶ 5 Chief Lowen testified that on March 10, 2006, he met with Gorski again and told him not to take any medication that was not prescribed. On April 6, 2006, Chief Lowen ordered Gorski to submit to a drug urine screen. Gorski's test came back positive for hydrocodone and hydromorphone.

¶ 6 Chief Lowen testified that nearly a year later, on April 12, 2007, he met with Gorski to discuss Gorski's "sick record" and use of prescription drugs. Chief Lowen required Gorski to submit to another drug urine screen. This screen also came back positive for hydrocodone and hydromorphone. Gorski told Chief Lowen that he knew the screen would come back positive, because he had received medication at an emergency room from a Dr. Gallant. Chief Lowen placed Gorski on paid administrative leave so Gorski could "seek counseling for his drug use *** and get things straightened out." Chief Lowen told Gorski that before he could return to work he would have to pass a fit-for-duty test, which included a urine screen.

¶ 7 Chief Lowen received a letter from Dr. Martin Fortier clearing Gorski to work as of June 5, 2007. The letter indicated that Gorski had been off pain medication for at least 10 days. Chief Lowen also testified that on June 7, 2007, he and Gorski scheduled the fit-for-duty test for June 11, 2007. On June 11, 2007, Gorski attempted to pass the test, but his urine screen came back positive for hydromorphone. Gorski told Chief Lowen that, before the urine screen, he had taken two Vicodin pills left over from Dr. Fortier's prescription. He also told Chief Lowen that, after the urine screen, he had taken two more Vicodin pills from the same prescription.

¶ 8 Chief Lowen testified that, on June 18, 2007, he presented Gorski with a return-to-work agreement that: prohibited him from using controlled substances other than those prescribed by a physician; required him to use any controlled substance only in a manner consistent with the prescription set forth by the prescribing physician; required him to provide the police department with documentation concerning any prescribed medication, indicating that the medication would not interfere with his duties as a police officer; and required him to submit to drug testing within one hour of any such request. Chief Lowen ordered Gorski to submit to a urine screen on July 3, 2007, but he did not submit to the screen because of illness. On July 11, 2007, at Chief Lowen's request, Gorski submitted to a urine screen, which came back negative.

¶ 9 On July 17, 2007, Gorski signed the return-to-work agreement, and he returned to work the following day. On July 18, his first day back to work, he submitted to a urine screen; the results would take nine days. Chief Lowen testified that, on the way to provide the sample, Gorski said that he was not taking Vicodin and he would not take it. As proof, Gorski gave Chief Lowen an empty prescription bottle from Dr. Fortier. Gorski submitted to another urine screen on July 26. The following day, Gorski's July 18 urine screen came back positive for a narcotic medication, oxymorphone. Chief Lowen suspended Gorski with pay. On August 9, the July 26 urine screen came back positive for hydrocodone, hydromorphone, oxycodone, and oxymorphone. Chief Lowen never received documentation from a physician that Gorski's medications would not interfere with his duties as a police officer.

¶ 10    Chief Lowen testified that Gorski told him that the drugs he took before the July 18 positive screen came from Dr. Fortier and that the drugs he took before the July 26 positive screen came from his father, Dr. Gorski. Gorski told Chief Lowen that his father gave him the drugs without a prescription. Chief Lowen testified that the integrity of the City of Woodstock was adversely affected by Gorski's failure to refrain from using prescription drugs and he recommended that Gorski be terminated.

¶ 11    Dr. Patrick Camadeca, a physician affiliated with Sherman Health Center, testified that he reviewed Gorski's urine screens. Gorski's urine screens on June 11, July 18, and July 26, 2007, tested positive for: hydromorphone; oxymorphone; and hydrocodone, hydromorphone, oxycodone, and oxymorphone, respectively.

¶ 12    Dr. Manuak Rana of the Illinois Pain Institute (Institute) testified that he treated Gorski for lower back pain from March through August 2006. Dr. Rana prescribed Gorski narcotic medication and also treated him with lumbar steroid injections. Dr. Rana testified that Gorski agreed to the Institute's policies that all narcotic medication would be prescribed only by a physician at the Institute, that all prescriptions would be filled only at a Walgreens pharmacy, and that Gorski would not increase the prescribed dose or obtain early refills.

¶ 13    Woodstock police officer James O'Doherty testified that during the first week in March 2006, at Gorski's request, he picked up and filled a prescription from a Dr. Keenan for a narcotic medication, Vicoprofen, and gave the medication to Gorski. Gorski was on duty at the time. O'Doherty also testified that between early 2006 and 2007 Gorski asked him approximately 10 times to ask his cousin, a doctor, to provide Gorski with pain medication.

¶ 14    Dr. Robin Purdy testified that, in early April 2006, he prescribed Dilaudid, a narcotic medication, to Gorski at an emergency room after Gorski complained of a headache and vomiting. Gorski did not to tell Dr. Purdy that he had a prescription for a narcotic medication from Dr. Rana.

¶ 15    Dr. Rana testified that, in mid-April 2006, he provided Gorski with another refill of a narcotic medication. Dr. Rana testified that, if he had known that Gorski had recently received Dilaudid from the emergency room physician, he would have changed Gorski's prescription. Dr. Rana also testified that, on August 31, 2006, he cancelled Gorski's prescription at Walgreens after calling the pharmacy. Dr. Rana decided not to prescribe any more narcotic medication to Gorski and did not see him after August 31, 2006.

¶ 16    Woodstock police officer Shane Marshall testified that, in November or December 2006, Gorski told Marshall that his back hurt. Marshall asked Gorski if there was anything he could do. Gorski asked Marshall if his girlfriend, a nurse, could obtain prescription pain medication. Marshall told him that she could not.

¶ 17    Dr. Purdy testified that during an office visit on March 5, 2007, Gorski complained of back pain. Before writing a prescription, Dr. Purdy telephoned several pharmacies to make sure Gorski was not obtaining narcotic medication from any other physicians. After his conversation with a Walmart pharmacy, Dr. Purdy decided to prescribe only Suboxone, to treat Gorski for his dependence on narcotic medication.

¶ 18    Gorski testified that he suffered from back pain caused by falls while on duty in the early 1990s and on September 11, 2005. He was treated by Dr. Rana at the Institute. Gorski signed

an agreement with Dr. Rana that all prescription pain medication would come only from the Institute. Gorski testified that Dr. Rana cancelled his prescription at Walgreens on August 31, 2006, because Gorski had obtained another prescription for a narcotic medication from his father. Gorski testified that using the narcotic medication prescribed by his father was a violation of the agreement he signed with the Institute. On September 20, 2006, Gorski saw Dr. Purdy, who prescribed him Lortab and instructed him not to take Norco, a narcotic medication, while taking Lortab. Gorski testified that, on November 30, 2006, he went to the Mercy Woodstock emergency room and was treated by a Dr. Abando, who prescribed him a narcotic medication.

¶ 19 Gorski testified that before he received his first dose of Suboxone he signed an agreement that prohibited him from taking any other narcotic drug. Gorski testified that he took Suboxone for about one month but that about nine days after starting, on March 17, 2007, he might have been treated by his father for back pain. Gorski could not recall whether his father prescribed him pain medication at that time. Dr. Purdy testified that Gorski did not complete his Suboxone treatment.

¶ 20 Gorski testified that, on April 8, 2007, he might have obtained a prescription for a narcotic pain medication from a Dr. Gallant at an emergency room after telling the doctor that he hit a pothole while on duty.

¶ 21 Gorski testified that, on April 18, 2007, he might have obtained a prescription for a narcotic pain medication from Dr. Shailesh Virani, at the Mercy Woodstock emergency room. Gorski might have complained of back pain after carrying a block of salt.

¶ 22 Gorski testified that, on or about April 27, 2007, he saw a Dr. Clairborne at the Mercy Woodstock emergency room for back pain. The doctor prescribed him a narcotic medication. On May 2, 2007, Gorski saw a Dr. Steinke of Crystal Lake Orthopedics for back pain, and he prescribed Ultram. On the same date, Gorski saw Dr. Fortier, who prescribed Vicodin.

¶ 23 Gorski testified that when he submitted a positive urine sample on June 11, 2007, he had taken two Vicodin pills from Dr. Fortier's prescription a "[c]ouple of days before." He believed that he had refilled the 100-tablet prescription but had only 50 pills left on July 18, 2007. Gorski testified that he told Chief Lowen that he took medication between June 11 and June 18, 2007. Further, when he submitted a positive urine sample on or about July 26, 2007, he was taking three medications given to him by his father.

¶ 24 Gorski also testified that he understood that, as a condition of the return-to-work agreement, he was required to provide documentation of any prescription medication he was taking. In addition, Gorski testified that having narcotic drugs in his system on or about July 26, 2007, was a violation of the return-to-work agreement.

¶ 25 After Chief Lowen rested his case-in-chief, Gorski filed a motion for a directed finding. On February 18, 2008, the Board granted Gorski's motion and ordered that the charges against him be dismissed. Chief Lowen filed a complaint for administrative review in the circuit court. On March 24, 2009, in case No. 08-MR-60, the circuit court reversed the Board's decision and remanded the case for further proceedings.

¶ 26 On remand, Gorski's case-in-chief consisted only of his testimony, which essentially repeated the testimony he provided during the first hearing. During this second hearing, he

also testified that he began with the police department in 1989 and received a copy of the police department's rules and regulations. Gorski testified that he never took medication that was not prescribed to him, always followed the dosing directions, and never took medication while on duty. Further, on April 4, 2006, he was admitted to the hospital and refused to take a narcotic pain medication offered to him by Dr. Purdy. Gorski took the narcotic medication as prescribed by Dr. Abando in November 2006. He began Suboxone treatment with Dr. Purdy in March 2007, but stopped the treatment after about one month because he was not experiencing any pain. On April 27, 2007, he was placed on administrative leave. In January 2008 and 2009, he had back surgeries to relieve his pain.

¶ 27    On August 4, 2009, after considering the evidence and the parties' arguments, the Board ordered that Gorski be terminated from his position as a police sergeant and member of the police department.

¶ 28    On September 3, 2009, Gorski filed a complaint for administrative review in the circuit court seeking: (1) reversal of the Board's August 4, 2009, order that terminated him; and (2) reinstatement of the Board's February 18, 2008, order that granted him a directed finding. In case No. 09-MR-304 the circuit court affirmed the Board's August 4, 2009, order and declined to reinstate the Board's February 18, 2008, order. This appeal followed.

¶ 29                                II. ANALYSIS

¶ 30                                A. Jurisdiction

¶ 31    Initially, we note that pursuant to Illinois Supreme Court Rules 301 (eff. Feb. 1, 1994) and 303 (eff. May 30, 2008) we have jurisdiction to review both of the Board's decisions, because the circuit court's first order was not a final order. See *Friedland v. Board of Trustees of the Moline Police Department Pension Fund*, 202 Ill. App. 3d 767, 769 (1990) ("[w]here a cause is remanded for further proceedings involving disputed questions of law or fact, the remanding order or judgment is not of a final character"); see also *Kvidera v. Board of Fire & Police Commissioners*, 168 Ill. App. 3d 380, 381 (1988) (an order remanding a cause to an administrative agency is not final and appealable because it does not terminate the litigation between the parties).

¶ 32                                B. The Board's Directed Finding

¶ 33    Gorski urges us to review the circuit court's March 24, 2009, order that reversed the Board's directed finding in his favor. Gorski fails to recognize that, in administrative review proceedings, we review the administrative agency's decision and not the decision of the circuit court. See *Roselle Police Pension Board v. Village of Roselle*, 232 Ill. 2d 546, 551-52 (2009). Accordingly, in this case, rather than reviewing the circuit court's decision that reversed the Board's directed finding, we will review the Board's decision that granted Gorski a directed finding.

¶ 34    A motion for a directed finding must be denied if the plaintiff has presented a *prima facie* case. *Midfirst Bank v. Abney*, 365 Ill. App. 3d 636, 651 (2006). In determining whether a plaintiff has presented a *prima facie* case, the court must weigh the evidence, including

evidence favorable to the defendant which may negate plaintiff's *prima facie* case. *Midfirst Bank*, 365 Ill. App. 3d at 651. Where an agency considers the weight and quality of the evidence and finds that no *prima facie* case remains, its decision to grant a directed finding will not be disturbed on appeal unless it is against the manifest weight of the evidence. See *527 S. Clinton, LLC v. Westloop Equities, LLC*, 403 Ill. App. 3d 42, 53 (2010).[1] A decision is against the manifest weight of the evidence only if the opposite conclusion is clearly evident. *Abrahamson v. Illinois Department of Professional Regulation*, 153 Ill. 2d 76, 88 (1992).

¶ 35   Further, an administrative agency's findings of fact are deemed *prima facie* true and correct. 735 ILCS 5/3-110 (West 2008); *City of Belvidere v. Illinois State Labor Relations Board*, 181 Ill. 2d 191, 205 (1998). Determinations as to weight of the evidence and credibility of witnesses are matters left to the agency and will not be disturbed on review unless they are against the manifest weight of the evidence. *Terrano v. Retirement Board of the Policemen's Annuity & Benefit Fund*, 315 Ill. App. 3d 270, 274 (2000). An administrative agency's conclusions of law, however, are afforded less deference and are reviewed on a *de novo* basis. *City of Belvidere*, 181 Ill. 2d at 205. When the agency's determination involves a mixed question of fact and law, the applicable standard of review is the clearly-erroneous standard, which falls between a manifest-weight-of-the-evidence standard and *de novo* review, so as to give some deference to the agency's experience and expertise. *City of Belvidere*, 181 Ill. 2d at 205.

¶ 36   In this case, Chief Lowen alleged that Gorski violated certain rules and regulations of the police department, including:

   "5-11 Obedience to Laws and Regulations. Members and employees shall observe and obey all Federal and State Laws, Municipal Ordinances, Rules and Regulations of the Department and Orders of the Department."

   "13-5 Truthfulness. Members and employees are required to be truthful at all times whether under oath or not."

   "12.1 Drug Free Work Place–Statement of Police. The unlawful manufacture, distribution, dispensations, possession or use of a controlled substance is prohibited in the City's workplace or at the worksite where City work is performed."

   "13.1 Drug and Alcohol Testing–Statement of Policy. In order to provide a drug free, healthful and safe secure workplace. . . . The unlawful . . . possession or use of a controlled substance or alcohol by employee is prohibited on all municipal premises, in any City own[ed] or leased motor vehicle, or at any other location where the employee is assigned to perform work."

The complaint alleged that Gorski's conduct constituted cause for discharge, as required by section 10-2.1-17 of the Municipal Code (65 ILCS 5/10-2.1-17 (West 2006)), because he

---

[1]Gorski argues that the circuit court failed to apply the manifest-weight-of-the-evidence standard. Although we have already determined that, on appeal, we will review the Board's, not the circuit court's, decision, we agree with Gorski that the standard of review is the manifest-weight-of-the-evidence standard. See *527 S. Clinton, LLC*, 403 Ill. App. 3d at 53.

violated the above rules and regulations, the return-to-work agreement with the police department, the Institute agreement, and the Suboxone treatment agreement and because of "his overall pattern of overlapping use and abuse of prescription narcotic drugs."

¶ 37       The record reveals that Chief Lowen established a *prima facie* case that Gorski abused prescription narcotic drugs and that, in doing so, he violated the rules and regulations of the police department, the return-to-work agreement, and agreements he had with Dr. Rana at the Institute and with Dr. Purdy regarding his drug-dependence treatment with Suboxone. The evidence established that Gorski abused narcotic drugs during his treatment with Dr. Rana. Dr. Rana testified that he prescribed Gorski narcotic medication from March through August 2006 for pain. Gorski agreed to the Institute's policies that all such medication would be prescribed only by a physician at the Institute, that prescriptions would be filled only at a Walgreens pharmacy, and that Gorski would not increase the prescribed dose or obtain early refills. However, Gorski violated this agreement four times. In March 2006, Gorski obtained a narcotic medication from O'Doherty, who picked up the medication, prescribed by Dr. Keenan, at Gorski's request. Gorski violated the agreement again in early April when he obtained a prescription for a narcotic medication from Dr. Purdy at an emergency room. Gorski obtained the medication by failing to disclose that he already had a prescription for a narcotic medication from Dr. Rana. Gorski then obtained another improper prescription for a narcotic medication by deceptive means from Dr. Rana in mid-April; Gorski failed to tell Dr. Rana that he recently received a prescription for Dilaudid from Dr. Purdy at the emergency room. Further, according to Gorski's testimony, on August 31, 2006, Dr. Rana cancelled Gorski's prescription at Walgreens because he had already obtained a prescription for a narcotic medication from his father.

¶ 38       The evidence also established that Gorski violated his agreement with Dr. Purdy regarding his drug-dependence treatment with Suboxone. The agreement prohibited Gorski from taking any other narcotic drug; he was given his first prescription of Suboxone in early March 2007. Yet Gorski violated his agreement a few weeks later when he obtained a prescription for a narcotic medication from Dr. Gallant at an emergency room. Gorski himself testified that he violated the agreement again a week later, on April 18, 2007, when he obtained another prescription for a narcotic medication from Dr. Virani at another emergency room. He also testified that he violated the agreement for a third time, 10 days later, when he obtained a prescription for a narcotic medication from a Dr. Clairborne.

¶ 39       Further, there was ample evidence that Gorski violated the return-to-work agreement. The agreement prohibited him from using any controlled substance not prescribed by a physician; provided that he could use a controlled substance only as prescribed; required him to provide documentation that the medication would not interfere with his duties as a police officer; and required him to submit to a drug test within one hour of a request. The agreement further provided that Gorski's continued employment was conditioned on his compliance with the agreement. Gorski signed the agreement on July 18, 2007.

¶ 40       It was uncontroverted that Gorski tested positive for narcotic medications, which are controlled substances, twice after he signed the return-to-work agreement. It was also uncontroverted that Gorski failed to provide documentation that the controlled substances were prescribed by a physician or that the medications would not interfere with his duties as

a police officer. Accordingly, in light of the evidence presented by Chief Lowen as well as Gorski's testimony, a *prima facie* case was established. Therefore, the Board's decision to grant Gorski's motion for a directed finding was against the manifest weight of the evidence.

¶ 41                          C. The Board's Termination of Gorski

¶ 42     Next, Gorski argues that the Board's ultimate decision to terminate him while his application for a line-of duty disability pension was pending was improper. Gorski cites *Walsh v. Board of Fire & Police Commissioners*, 96 Ill. 2d 101 (1983), and *Lynch v. City of Waukegan*, 363 Ill. App. 3d 1078 (2006), to support his argument. Both *Walsh* and *Lynch* are distinguishable from this case.

¶ 43     In *Walsh*, after a police officer was diagnosed with psychiatric problems and placed on medical leave with a disability pension, he held his wife and friend at gunpoint and shot his friend. *Walsh*, 96 Ill. 2d at 104. The police department sought termination and, after a hearing, the Board terminated the police officer. *Walsh*, 96 Ill. 2d at 103. The supreme court ultimately vacated the judgments of the appellate court and the circuit court and remanded the case to the board "for the submission by either party of further evidence that is relevant to the issue of whether [the police officer's] misconduct was substantially the result of the psychiatric problems that led to his prior medical suspension." *Walsh*, 96 Ill. 2d at 108.

¶ 44     Similarly, in *Lynch*, a firefighter diagnosed with psychiatric disorders was discharged by the commissioners of the Waukegan civil service while his application for a disability pension was pending. *Lynch*, 363 Ill. App. 3d at 1085, 1087-88. While his appeal was pending, the City of Waukegan's pension board granted him a duty-related disability pension. *Lynch*, 363 Ill. App. 3d at 1085. This court held that the commission erred by terminating the firefighter due to his disorders, reasoning that "[u]nder *Walsh*, a firefighter cannot be discharged for misconduct that is substantially related to the psychiatric condition that was the basis for his pension award." *Lynch*, 363 Ill. App. 3d at 1088.

¶ 45     In contrast to *Walsh* and *Lynch*, nothing in the record indicates that Gorski has been granted or has even applied for a duty-related disability pension. We note that Gorski's attorney stated during argument before the Board that Gorski had filed an application. However, Chief Lowen's attorney stated that he knew nothing about the application, and the record is void of any such application. Assuming, *arguendo*, that Gorski had filed an application for a disability pension, *Walsh* and *Lynch* still would not apply to this case, because nothing in the record indicates that Gorski's misconduct was substantially related to his back injury. In violation of agreements with the police department and doctors, Gorski obtained by deceptive means multiple prescriptions for narcotic medications from multiple doctors and took these medications while on duty. He failed to provide the police department with the required documentation that he was taking medication prescribed by physicians and that the medication would not affect his ability to perform his duties. There is no evidence in the record indicating that such misconduct was substantially related to his back injury. Thus, neither *Walsh* nor *Lynch* is applicable to this case.

¶ 46     Gorski also argues that this court should not be bound by the circuit court's decision affirming the Board's decision terminating him, because it was the result of the circuit

court's first decision, which was against the manifest weight of the evidence, and the Board's two decisions were conflicting. Gorski fails to recognize that we are not bound by the circuit court's decisions; rather, we are bound to review the correctness of the proceedings before the Board. See *Roselle Police Pension Board*, 232 Ill. 2d at 551-52. Thus, we will not review either of the circuit court's decisions.

¶ 47 Finally, Gorski argues that the Board's decision to terminate him was against the manifest weight of the evidence. Gorski argues that it was the result of the circuit court's first decision "which was erroneous as a matter of law because" it failed to apply the manifest-weight-of-the-evidence standard. In addition to being an inappropriate, circuitous argument on the merits of the Board's initial decision, this argument is forfeited because Gorski failed to comply with Illinois Supreme Court Rule 341(h)(7) (eff. July 1, 2008). Rule 341 requires that argument "shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on. *** Points not argued are waived ***." In this case, Gorski makes a cursory argument without setting forth factual bases for such with citation to the record. We will not sift through the record to find support for Gorski's unsupported argument. See *Del Real v. Northeast Illinois Regional Commuter R.R. Corp.*, 404 Ill. App. 3d 65, 73 (2010). Accordingly, Gorski's argument is forfeited. See *Del Real*, 404 Ill. App. 3d at 73. However, even if Gorski had not forfeited this issue, we would not reverse the Board's ultimate decision to terminate him. We have determined that there was a *prima facie* showing of a basis for termination during the initial Board proceeding. Gorski has failed to establish that he presented evidence on remand to sufficiently refute the *prima facie* case or that the Board's ultimate decision to terminate him was against the manifest weight of the evidence.

¶ 48                                III. CONCLUSION

¶ 49 The judgment of the circuit court of McHenry County is affirmed.

¶ 50 Affirmed.