Nos. 2--06--0133 & 2--06--0187 cons.　　　　　　　　filed: 11/29/06

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| JOHN HAMMOND, | ) | Appeal from the Circuit Court |
| | ) | of Du Page County. |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | Nos. 05--MR--44 |
| | ) | 05--MR--570 |
| | ) | |
| THE FIREFIGHTERS PENSION FUND | ) | |
| OF THE CITY OF NAPERVILLE, THE | ) | |
| BOARD OF TRUSTEES OF THE FIRE- | ) | |
| FIGHTERS PENSION FUND OF THE | ) | |
| CITY OF NAPERVILLE, and TRUSTEES | ) | |
| THOMAS OKER, JIM HARDING, MIKE | ) | |
| ZYWANSKI, DONALD FAULHABER, | ) | |
| JOHN WU, GEORGE PRADEL, SUZANNE | ) | |
| GAGNER, and DOUGLAS KRIEGER, and | ) | |
| THE CITY OF NAPERVILLE, | ) | Honorable |
| | ) | Edward R. Duncan, Jr., |
| Defendants-Appellees. | ) | Judge, Presiding. |

| | | |
|---|---|---|
| JOHN HAMMOND, | ) | Appeal from the Circuit Court |
| | ) | of Du Page County. |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | Nos. 05--MR--44 |
| | ) | 05--MR--570 |
| | ) | |
| THE FIREFIGHTERS PENSION FUND | ) | |
| OF THE CITY OF NAPERVILLE, THE | ) | |
| BOARD OF TRUSTEES OF THE FIRE- | ) | |
| FIGHTERS PENSION FUND OF THE | ) | |
| CITY OF NAPERVILLE, and TRUSTEES | ) | |
| THOMAS OKER, JIM HARDING, MIKE | ) | |
| ZYWANSKI, DONALD FAULHABER, | ) | |

Nos. 2--06--0133 & 2--06--0187 cons.

JOHN WU, GEORGE PRADEL, SUZANNE )
GAGNER, and DOUGLAS KRIEGER, and )
THE CITY OF NAPERVILLE,                    )      Honorable
                                           )      Edward R. Duncan, Jr.,
        Defendants-Appellees.              )      Judge, Presiding.
_____

JUSTICE O'MALLEY delivered the opinion of the court:

Plaintiff, John Hammond, filed two administrative review actions (case Nos. 05--MR--44 and 05--MR--570) in the circuit court of Du Page County against defendants, the Firefighters Pension Fund of the City of Naperville, its board of trustees (Board) and each of the trustees, and the City of Naperville. In both actions, plaintiff sought review of the same decision of the Board to award him a nonduty disability pension rather than a line-of-duty disability pension. The trial court dismissed case No. 05--MR--570 and entered judgment in case No. 05--MR--44 affirming the Board's decision. Plaintiff then filed two separate notices of appeal, and we docketed the appeals as case No. 2--06--0133 and case No. 2--06--0187. For the reasons that follow, we dismiss the appeal in case No. 2--06--0187. We also vacate the judgment in case No. 05--MR--44 and enter an order dismissing the case for lack of jurisdiction. In addition, we reverse the dismissal of case No. 05--MR--570 and enter judgment affirming the decision of the Board.

Plaintiff joined the Naperville fire department (Department) in May 1991. Prior to joining the Department, he was given a psychological assessment. Although plaintiff was found to possess the "necessary level of intellect *** to successfully function" as a firefighter and paramedic, the evaluation noted a number of negative traits such as lack of self-confidence; vulnerability to environmental stress; impulsiveness; intolerance of those with different values from his own; and resistance to authority. Early in his career as a Naperville firefighter and paramedic, some evaluations of plaintiff's performance indicated the need for improvement in certain areas. Plaintiff perceived the

criticism as unfair. While working for the Department, plaintiff also served as a firefighter and paramedic for the Woodstock fire department.

In January 2001, plaintiff experienced an episode of shortness of breath and chest tightness while pulling a hose at the scene of a fire. During an ambulance call the following month, plaintiff experienced lightheadedness, shortness of breath, and chest discomfort. A cardiologist who examined plaintiff concluded that he was not suffering from coronary artery disease. The cardiologist noted that the episodes coincided with emotional stress and that they might be related to plaintiff's elevated blood pressure.

In March 2001, plaintiff advised his personal physician that he had experienced periods of depression and anxiety. Plaintiff's physician concluded that plaintiff was suffering from anxiety or panic attacks and referred him to Dr. E.V. Gumapas, a psychiatrist. Dr. Gumapas placed plaintiff on antidepressant medication. In May 2001, plaintiff began to receive counseling from Jeffrey Martin, a licensed clinical social worker.

On September 14, 2001, plaintiff lost his composure after an incident involving a fellow firefighter. The firefighter, who needed medical attention, refused to permit plaintiff to provide assistance. Later, plaintiff cried in the presence of superior officers who approached him to discuss the matter. Early in 2002, plaintiff was reprimanded for an incident that occurred during his annual physical examination for the Department. Plaintiff joked with a nurse, who perceived his statements as sexual harassment. Around this time, plaintiff told Jeffrey Martin that he had experienced dry mouth, shortness of breath, and shaking while delivering a baby. Martin noted that plaintiff was highly anxious. Plaintiff also related concerns about whether he would be able to continue working. In February 2002, plaintiff spoke with a superior officer and expressed doubts about whether he

(plaintiff) could continue to do his job. In particular, plaintiff was concerned about his physical fitness level.

On February 27, 2002, plaintiff was placed on administrative leave and was referred to Dr. Brian Svazas for an evaluation of fitness for duty. Dr. Svazas examined plaintiff on March 12, 2002. According to Dr. Svazas's report, plaintiff advised him of the two episodes in 2001 where he had become short of breath. Plaintiff also related another episode of shortness of breath that occurred while on duty for the Woodstock fire department in February 2002, as plaintiff was attempting to extricate an accident victim from a vehicle. Plaintiff also related that he had been diagnosed with plantar fasciitis, a foot injury. Plaintiff reported experiencing neck strain; he suggested that donning and doffing air packs might be aggravating the condition. Dr. Svazas noted that plaintiff had expressed some anxiety about his lack of conditioning and about his coworkers' reaction to his physical condition. Plaintiff also felt that problems with a superior officer were contributing to the stress he was suffering. Dr. Svazas reexamined plaintiff on April 9, 2002. Plaintiff noted that his panic symptoms were under control, and his last true panic attack had occurred about a year earlier.

Dr. Svazas referred plaintiff to a psychologist, J. Preston Harley, for an assessment of his readiness to return to work. During the examination, plaintiff related that he experienced panic or anxiety attacks and that he was getting counseling on a weekly basis from Jeffrey Martin. Plaintiff indicated that he believed his episodes of shortness of breath were the result of anxiety. Plaintiff acknowledged feelings of depression, and indicated that he had become progressively more emotionally sensitive to the issues of the victims of fires and other emergencies. Dr. Harley noted that personality testing indicated that at an interpersonal level, plaintiff was apt to be intolerant and

insensitive, and to be suspicious of others and blame them for his negative frame of mind. Dr. Harley recommended that plaintiff return to full duty with the Department when physically able.

Plaintiff was assigned to alternate duty on March 11, 2002. A memorandum dated April 23, 2002, from one of plaintiff's superiors to the chief of the Department, indicated that since March 11, 2002, plaintiff had reported for duty fewer than seven days. The memorandum expressed concern that plaintiff failed to accept responsibility for his actions and that there were "issues" concerning plaintiff's work performance and interpersonal communication with staff officers and coworkers. During April 2002, plaintiff received his annual performance review. He was found to need improvement in the categories of "job knowledge, skills proficiency," "dependability," "teamwork," and "leadership/judgment/decision making."

On May 1, 2002, Dr. Svazas concluded that plaintiff was fit to return to full duty. On May 9, 2001, in response to plaintiff's performance review, the Department instituted a "performance improvement plan." The plan called for plaintiff's progress to be evaluated after 90 days and further provided that if plaintiff's performance was not rated at least "proficient," further corrective action might be taken, including a possible recommendation that he be terminated from the Department.

On June 26, 2002, plaintiff was reassigned to administrative duties and again referred to Dr. Svazas. Plaintiff related to Dr. Svazas that he had become short of breath during a training exercise that involved pulling a 180-pound mannequin along the floor while wearing breathing apparatus. Plaintiff reported that he broke down in tears after failing to complete the exercise. Dr. Svazas referred plaintiff to Dr. Harley for reevaluation. Dr. Harley noted that plaintiff had continued to experience anxiety in the work setting. On July 22, 2002, Dr. Svazas advised the Department that it was not safe for plaintiff to return to full firefighting duties. Dr. Svazas recommended that plaintiff

visit a mental health specialist on a weekly basis and visit a psychiatrist on a regular basis. About a week earlier, plaintiff had begun treatment with Dr. Eshwar P. Gumidyala, a psychiatrist. Plaintiff reported to Dr. Gumidyala that he had good results with the medication prescribed by Dr. Gumapas, but had difficulty scheduling appointments with Dr. Gumapas. Dr. Gumidyala's diagnosis was, in part, as follows:

"AXIS I:     Major Depression

Rule out Panic Disorder without Agoraphobia"

The Department placed plaintiff on alternate duty on August 12, 2002. In November 2002, Drs. Svazas and Harley cleared plaintiff for return to full duty.

Early in 2003, plaintiff's father became ill and ultimately succumbed to his illness. Plaintiff took leave in connection with his father's illness and death. Plaintiff's mother had died about five years earlier.

In January 2003, plaintiff was examined by Edward McGarrigle, Psy.D. Plaintiff reported a history of panic attacks beginning about four years earlier, but indicated that he had not had a panic attack during the preceding year. Plaintiff also reported feeling depressed for about four or five years. In addition, he admitted having problems with two of his supervisors. On his second visit to Dr. McGarrigle, plaintiff indicated that he was not feeling unduly anxious, except with respect to his sense that he was being unfairly scrutinized at work by his supervisors. At a subsequent visit, plaintiff expressed anger that he had been charged for an appointment that he cancelled with only an hour's notice. Dr. McGarrigle and plaintiff discussed the possibility that plaintiff's anger might be related to an expectation of special treatment and to problems with authority figures. Also, plaintiff told Dr. McGarrigle that he expected to lose his job.

In March 2003, plaintiff began to see Dr. Gumapas again. He also discontinued treatment with Dr. McGarrigle and began treatment with Lisa Campbell, Psy.D. Plaintiff informed Dr. Campbell that he was nearing the end of the 90-day period under his performance improvement plan and had failed to accomplish certain objectives. Plaintiff believed that his current supervisor wanted him terminated from the Department. According to Dr. Campbell, other sources of stress included the recent death of plaintiff's father and conflicts with his stepmother concerning his father's estate. Plaintiff indicated that he first noticed signs of depression in 2000. He would get depressed about the tragedies he encountered in his work. At a March 27, 2003, appointment with Dr. Campbell, plaintiff reported that he had failed certain tests administered in connection with the performance improvement plan and had been told by a superior officer that he was not fit to be a firefighter. In addition, plaintiff was experiencing marital problems. At an appointment on April 3, 2003, plaintiff told Dr. Campbell that he had been placed on suspension for 10 days following his unfavorable performance review. Two weeks later, plaintiff advised Dr. Campbell that he had returned to work for "testing." However, plaintiff left at lunchtime on the second day, saying that anxiety was making his stomach sore. He reported that he expected to be fired or placed on disability. Thereafter, plaintiff applied to the Department for leave under the Family and Medical Leave Act of 1993 (FMLA) (29 U.S.C. §2601 et seq. (1994)).

On June 25, 2003, plaintiff applied to the Board for a disability benefit. On September 10, 2003, Michael L. Fields, Ph.D., and Robert M. Pasen, Ph.D., conducted a psychological evaluation of plaintiff. Their written report indicated that "[t]he overall impression is of an individual who has most assuredly been experiencing very significant depression, anxiety, and panic attacks for quite

some time, and it appears that the nature of these symptoms are [sic] tied very directly to the cumulative trauma, demand, and pressure of his job as a fireman/paramedic."

Independent medical examinations were conducted by Diane Goldstein, Ph.D., a psychologist, and by psychiatrists Richard P. Harris, M.D., Lyle H. Rossiter, Jr., M.D., and Robert A. Reff, M.D. Dr. Goldstein concluded that plaintiff suffered from an adjustment disorder and a personality disorder. She also concluded that plaintiff's reported panic attacks did not meet the diagnostic criteria for a panic disorder, and that his medical and mental health records did not establish that he had any disorder related to witnessing traumatic events in the course of his work. Dr. Goldstein noted that plaintiff's exposure to traumatic events had been given little emphasis in his mental health records and that he had not been diagnosed with a trauma-related disorder until after he applied for disability benefits. Moreover, plaintiff's reported panic symptoms related to physically challenging situations, not traumatizing ones. Dr. Goldstein concluded that the symptoms of plaintiff's adjustment disorder were not so disabling as to prevent him from carrying out his duties as such, although they contributed to rendering him unfit to perform his duties. Likewise, in Dr. Goldstein's view, plaintiff's personality disorder--which was characterized by a maladaptive way of thinking, behaving, experiencing emotion, and interacting with others--was disruptive to his ability to function and resolve conflicts in the work environment, but was not itself disabling. Dr. Goldstein observed that plaintiff's psychiatric difficulties while on the job were mild to moderate and related to job stress and dissatisfaction stemming from interpersonal problems with supervisors, challenges posed by the physical requirements of the job, and discomfort with the retraining and review process. Dr. Goldstein further concluded that plaintiff's emotional distress did not relate to any identifiable injury or accident.

Dr. Harris concluded that plaintiff suffered from an anxiety disorder that had been successfully treated by the time of Dr. Harris's evaluation. Dr. Harris noted that plaintiff exhibited "elements" of depression, but had not suffered from a major depressive disorder. It was Dr. Harris's belief that plaintiff's problems with the Department stemmed from interpersonal difficulties and might have been alleviated if plaintiff had different supervisors. Dr. Harris noted that plaintiff had long-standing psychological problems--periods of alcohol abuse, anxiety, and possible depression--that likely became more prominent with the death of his mother in 1998 and his father in 2003. The psychological problems, combined with the tension between plaintiff and his supervisors, significantly impaired plaintiff's ability to function in the Department. According to Dr. Harris, plaintiff was disabled due to these psychological problems, but the disability was not duty related. In particular, Dr. Harris rejected the idea that plaintiff's problems were related to witnessing traumatic events.

Dr. Rossiter concluded that plaintiff had a "duty-related" disability that rendered him unable to perform his duties with the Department. Dr. Rossiter stated that the disability was "the consequence of a *** long[-]standing anxiety and depressive disorder with post-traumatic features that arose in connection with [plaintiff's] work as a firefighter."

Dr. Reff concluded that plaintiff was disabled as a result of a psychiatric condition that Dr. Reff did not specifically identify. Dr. Reff further concluded that "it appears more likely than not that the cumulative effects of the acts of [plaintiff's] duty as a firefighter/paramedic caused or contributed to the development of his disabling condition."

A hearing on plaintiff's application was held on December 4, 2004, and December 9, 2004. After the close of evidence, the Board deliberated in a closed session. Upon returning to open session, the Board voted to award plaintiff a nonduty disability pension and deny his request for a

line-of-duty disability pension. The Board voted to direct its counsel "to draft an order that reflects the discussion of this Board to be voted on at a later date." However, on December 9, 2004, the Board issued a memorandum to plaintiff, advising him that he had been awarded a nonduty pension and setting forth the amount of the benefit. On January 11, 2005, plaintiff filed a complaint for administrative review of the Board's decision. The complaint was docketed as case No. 05--MR--44. The Board unsuccessfully moved to dismiss the complaint on the basis that it was premature because the Board had not yet issued its written decision. The Board ultimately adopted a written decision on April 27, 2005. The Board's written decision establishes that the Board: (1) discredited plaintiff's accounts of panic attacks on emergency calls in those instances when plaintiff did not report the symptoms to his supervisors; (2) discredited evidence that plaintiff was emotionally harmed by witnessing traumatic events; (3) concluded that personality conflicts, not plaintiff's duties in emergency situations, impeded his ability to function as a firefighter/paramedic; and (4) credited Dr. Harris's conclusion that plaintiff's problems in the Department related to interpersonal difficulties and long-standing psychological problems.

On May 20, 2005, plaintiff filed a second complaint for administrative review, which was docketed as case No. 05--MR--570. The trial court consolidated the administrative review proceedings, but on July 20, 2005, the trial court granted a motion by the Board to dismiss case No. 05--MR--570. On January 6, 2006, the trial court entered an order affirming the Board's decision. The trial court modified that order on February 2, 2006. That same day, plaintiff filed a notice of appeal indicating that plaintiff was appealing from the July 20, 2005, order dismissing case No. 05--MR--570. The appeal was docketed as case No. 2--06--0133. Thereafter, on February 16, 2006,

plaintiff filed a second notice of appeal, which indicated that the appeal was taken from the February 2, 2006, order.

At the outset, we note that there is but one appealable order entered in this case: the February 2, 2006, order modifying the January 6, 2006, order affirming the Board's decision. Because there is only one order from which an appeal can be taken, there is no basis for two separate appeals by the same party. Plaintiff perfected his appeal when he filed his first notice of appeal. Although the second notice of appeal is not designated as an amended notice of appeal, in our view it is properly regarded as such. We note that within the period for filing the notice of appeal, an appellant may amend the notice of appeal without leave of court. Official Reports Advance Sheet No. 22 (October 26, 2005), R. 303(b)(4), eff. January 6, 2006. Accordingly, we dismiss the appeal in case No. 2--06--0187.

We next address a question concerning the trial court's jurisdiction. Section 3--103 of the Administrative Review Law (735 ILCS 5/3--103 (West 2004)) provides, in pertinent part, that "[e]very action to review a final administrative decision shall be commenced by the filing of a complaint and the issuance of summons within 35 days from the date that a copy of the decision sought to be reviewed was served upon the party affected by the decision." Plaintiff filed two separate complaints for administrative review. He filed the first complaint within 35 days after the Board issued a memorandum dated December 9, 2004, notifying plaintiff that he had been awarded a nonduty pension, and he filed the second complaint within 35 days after the Board mailed him a copy of its written "Findings and Decision" adopted on April 27, 2005. The question presented is whether the initial written memorandum or the Board's subsequent formal written decision triggered the 35-day period for seeking administrative review.

In <u>Johnson v. Machetti</u>, 228 Ill. App. 3d 420 (1992), the plaintiff, a police officer, sought review of a decision of the Peoria Police Pension Fund board of trustees to award him a nonduty disability pension rather than a line-of-duty disability pension. After the hearing on the officer's pension application, the plaintiff was notified by letter that his application was approved. The letter indicated that the plaintiff's monthly benefit would be $1,549.10. The plaintiff determined that this amount was only 50% of his annual salary. However, he did not seek immediate review of the decision, but instead submitted to the board a medical report indicating that his disability was job-related. About a year later, the board responded to plaintiff that its earlier decision was final. The plaintiff then filed a complaint for administrative review. The plaintiff argued that the initial notification of his pension benefit was insufficient to trigger the 35-day period for seeking administrative review. The <u>Johnson</u> court disagreed:

"Plaintiff contends that the letter was inadequate notice because it did not inform him that the Pension Board had awarded a 50% disability pension instead of a 65% disability pension. Officers disabled in the line of duty are entitled to a disability pension in the amount of 65% of their annual salary [citation]. The letter did inform plaintiff that he would receive $1,549.10 per month, which was an amount equal to 50% of his salary. Plaintiff, in his amended complaint, admits that the 1988 letter put him on notice that he had received a non-line-of-duty disability pension. On appeal, plaintiff admits that when he received the letter he made the calculation and discovered that he had been awarded a pension at the rate of 50%. The record reflects plaintiff was present at the October 13, 1988, Pension Board meeting where the matter of his disability pension was discussed. Plaintiff presented letters from doctors and other information to the Pension Board. A motion was made, seconded and

passed that plaintiff be awarded a 50% non-job-related disability pension based on an annual salary of $37,178.36, resulting in a monthly disability benefit of $1,549.10 per month [sic]. This is the same figure that appeared in the October 27, 1988, letter. We find no merit to plaintiff's contention that the letter failed to inform him that he had not been awarded a line of duty disability pension." Johnson, 228 Ill. App. 3d at 422-23.

Johnson is distinguishable. There is no indication in Johnson that the board had ever indicated that it intended to issue a formal written decision. Here, in contrast, the Board specifically voted to direct its counsel to draft a written order to be voted upon at a later date. Clearly, plaintiff was aware that the initial memorandum notifying him of the Board's decision was not intended to be the Board's full expression of its decision. Plaintiff cannot be faulted for exercising prudence by assuming, in light of Johnson, that the December 9, 2004, memorandum constituted the Board's decision for purposes of section 3--107. However, in our view, this case is governed by Lutheran General Health Care System v. Department of Revenue, 231 Ill. App. 3d 652 (1992). In Lutheran General, a copy of an administrative law judge's decision denying the plaintiffs' request for a tax exemption was mailed to the plaintiffs on January 12, 1990. However, a page was missing from the copy. A complete copy of the 7½-page decision was mailed to the plaintiffs on January 22, 1990. The plaintiffs filed their complaint for administrative review on February 21, 1990. The Lutheran General court concluded that the 35-day period was not triggered until the complete copy of the decision was mailed to the plaintiffs. The court reasoned as follows:

"[T]he 35-day period for administrative review does not begin to run until the administrative agency has provided the plaintiff with adequate notice of its decision. This is because the right to review includes not only the right to present evidence but also a reasonable

opportunity to know what claims must be defended against and what consequences are proposed. [Citation.] To be effectual the notice should be so full and clear as to disclose to persons of ordinary intelligence what is proposed; and in making the determination of whether there has been adequate notice, the test is whether the recipient should have anticipated the effects and orders possible. [Citations.]

***

We find that while the portion of the first decision mailed to plaintiffs was sufficient to inform them that [the administrative law judge] had denied their request for an exemption, it was insufficient to inform them of what claims should be addressed in their complaint for administrative review.

The failure to include a full page of the 7½-page decision was not a minor omission. Until a complete copy of the decision was received, plaintiffs had no way of knowing that [the administrative law judge] failed to address the school exemption issue; nor could they know the precise grounds on which [the administrative law judge] relied in denying them tax-exempt status. While plaintiffs could have filed a complaint for administrative review without this information, we believe it would be unfair to require them to file a complaint where they can only guess at the contents of the decision they are seeking to have reviewed.

Accordingly, we hold that the phrase 'copy of the decision' as used in section 3--103 should be read as requiring that plaintiffs be served with a complete copy and not just a portion of the decision." Lutheran General, 231 Ill. App. 3d at 659-60.

Here, plaintiff was aware that, after completing its deliberations in closed session and then voting on the record to award only a nonduty pension, the Board directed its counsel "to draft an order that

reflects the discussion of this Board to be voted on at a later date." Under these circumstances, the memorandum issued the same day as the hearing clearly was <u>not</u> the Board's complete decision.

We hold that service of the Board's April 27, 2005, written findings and decision triggered the 35-day period. Plaintiff's first complaint (in case No. 05--MR--44) was premature; his second (in case No. 05--MR--570) was timely. The trial court should have dismissed case No. 05--MR--44 for lack of jurisdiction. Conversely, jurisdiction was proper in case No. 05--MR--570, and the trial court erred in dismissing that case.

Plaintiff's next issue pertains to joinder of parties in the administrative review proceeding. In his complaint for administrative review, plaintiff named the Board and each of its trustees, including John Wu, the chief of the Department. Chief Wu had recused himself from the hearing on plaintiff's application for pension benefits; he did so because he had instituted a separate proceeding to discharge plaintiff from his employment with the Department. During the administrative review proceeding, defendants moved to dismiss Chief Wu on the basis that he was not a party of record to the underlying administrative proceeding. Defendants also moved to dismiss the other individual trustees on the basis that they were not necessary parties to the administrative review proceeding. The trial court granted the motion as to Chief Wu, but refused to dismiss the other individual trustees from the action. Plaintiff argues that the dismissal of Chief Wu was error, because, in plaintiff's view, Chief Wu was a party to the administrative proceeding notwithstanding his recusal. Plaintiff contends that section 3--107(a) of the Administrative Review Law (735 ILCS 5/3--107(a) (West 2004)) required joinder of all parties to the administrative proceeding, and the failure to join Chief Wu would have deprived the trial court of subject matter jurisdiction.

In support of this argument, plaintiff cites this court's decision in <u>Orlowski v. Village of Villa Park Board of Fire & Police Commissioners</u>, 273 Ill. App. 3d 42 (1995), which held that the failure to name individual members of a board of police and fire commissioners mandated dismissal of the complaint. During the relevant time frame in <u>Orlowski</u>, section 3--107(a) provided as follows:

> "Except as provided in subsection (b), in any action to review any final decision of an administrative agency, the administrative agency and all persons, other than the plaintiff, who were parties of record to the proceedings before the administrative agency shall be made defendants." 735 ILCS 5/3--107(a) (West 1992).

However, after <u>Orlowski</u> was decided, the General Assembly added the following language to section 3--107(a):

> "No action for administrative review shall be dismissed for lack of jurisdiction based upon the failure to name an employee, agent, or member, who acted in his or her official capacity, of an administrative agency, board, committee, or government entity, where the administrative agency, board, committee, or government entity, has been named as a defendant as provided in this Section. Naming the director or agency head, in his or her official capacity, shall be deemed to include as defendant the administrative agency, board, committee, or government entity that the named defendants direct or head. No action for administrative review shall be dismissed for lack of jurisdiction based upon the failure to name an administrative agency, board, committee, or government entity, where the director or agency head, in his or her official capacity, has been named as a defendant as provided in this Section." Pub. Act 89--685, §25, eff. June 1, 1997.

Accordingly, plaintiff's jurisdictional argument is without merit.

In his reply brief, plaintiff argues for the first time that he needed to join Chief Wu in the administrative review action in order to invoke the holding of Lynch v. City of Waukegan, 363 Ill. App. 3d 1078, 1087 (2006), that a firefighter could not be discharged for cause based on misconduct that was "substantially related" to psychiatric problems that formed the basis for awarding the firefighter a disability pension. However, the result in Lynch did not depend in any way on an identity of the parties in the discharge proceedings and the pension proceedings. Thus, the argument is meritless.

Plaintiff next challenges the Board's decision denying him a line-of-duty pension. Section 4--110 of the Illinois Pension Code (Code) (40 ILCS 5/4--110 (West 2004)) provides, in pertinent part:

"If a firefighter, as the result of sickness, accident or injury incurred in or resulting from the performance of an act of duty or from the cumulative effects of acts of duty, is found *** to be physically or mentally permanently disabled for service in the fire department *** the firefighter shall be entitled to a disability pension equal to the greater of (1) 65% of the monthly salary attached to the rank held by him or her in the fire department at the date he or she is removed from the municipality's fire department payroll or (2) the retirement pension that the firefighter would be eligible to receive if he or she retired (but not including any automatic annual increase in that retirement pension)."

We have recently articulated the following principles governing review of decisions of administrative agencies:

"In an appeal from the judgment in an administrative review proceeding, the appellate court reviews the administrative agency's decision, not the trial court's. [Citation.] The standard of review applicable to an agency's decision depends on the type of question

-17-

presented.  An agency's findings of fact will be upheld unless against the manifest weight of the evidence, i.e., unless the opposite conclusion is clearly evident.  [Citation.]  On the other hand, an agency's rulings on questions of law are reviewed de novo.  [Citation.]

Mixed questions of law and fact are reviewed under an intermediate standard. [Citation.]  A mixed question exists where the historical facts are admitted or established, the rule of law is undisputed, and the only issue is whether the facts satisfy the settled statutory standard.  [Citation.]  The agency's decision will be upheld unless it is clearly erroneous--that is, unless the reviewing court is left with a definite and firm conviction that a mistake has been committed.  [Citation.]"  Dowrick v. Village of Downers Grove, 362 Ill. App. 3d 512, 515 (2005).

In this case, there was conflicting evidence as to the material historical facts, particularly the nature of plaintiff's emotional condition and its cause.  These are questions of fact, and the standard of review applicable to the Board's findings is the manifest weight of the evidence standard.  The Board found that plaintiff's problems stemmed from interpersonal difficulties rather than plaintiff's duties in emergency situations.  The finding is not against the manifest weight of the evidence.  The remaining question, therefore, is whether the facts, as found by the Board, satisfy the standard for awarding a line-of-duty pension.  The Board, of course, found that they did not.  We conclude that the Board's decision was not clearly erroneous.

For purposes of determining the right to a line-of-duty disability pension under section 4--110, courts apply the definition of "act of duty" set forth in section 6--110 of the Code (40 ILCS 5/6--110 (West 2004)).  Jensen v. East Dundee Fire Protection District Firefighters' Pension Fund Board of Trustees, 362 Ill. App. 3d 197, 203-04 (2005).  Under section 6--110, "act of duty" means "[a]ny act

imposed on an active fireman by the ordinances of a city, or by the rules or regulations of its fire department, or any act performed by an active fireman while on duty, having for its direct purpose the saving of the life or property of another person." 40 ILCS 5/6--110 (West 2004).

We note that in <u>Graves v. Pontiac Firefighters' Pension Board</u>, 281 Ill. App. 3d 508, 515 (1996), it was held that a firefighter's "general job dissatisfaction or job stress arising from the inability to handle general duties does not give rise to a duty-related disability pension." The court indicated that even where general aspects of a firefighter's duties cause or contribute to a psychological disability, "stress or depression resulting from general employment functions inherent in the occupation and common to all firefighters [is] not the equivalent of the specific acts of duty contemplated by the statute." <u>Graves</u>, 281 Ill. App. 3d at 515. It is not entirely clear, however, whether <u>Graves</u> is still good law. <u>Graves</u> relied on cases involving the definition of "act of duty" applicable to police officers. However, this court has recently held that that definition does not apply in pension cases involving firefighters. <u>Jensen</u>, 362 Ill. App. 3d at 203-04.

Assuming for the sake of argument that--contrary to <u>Graves</u>--a line-of-duty disability pension may be awarded for a disability caused by general occupational pressures, the Board's decision here still was not clearly erroneous. Although plaintiff may have experienced severe stress on the job, the Board apparently was persuaded by evidence that plaintiff's duties merely <u>triggered</u> <u>symptoms</u> of one or more disorders rooted in nonoccupational sources. There was evidence that plaintiff's inability to function as a firefighter resulted from features of his personality, including poor interpersonal skills and excessive sensitivity to criticism or disapproval from authority figures, and that other personal problems--marital difficulties and the death of plaintiff's parents--contributed to plaintiff's occupational problems. In other words, although plaintiff may have suffered acute stress in certain

occupational situations, the underlying causes were external to, and independent of, his duties as a firefighter/paramedic. As such, the Board's decision to deny plaintiff a line-of-duty disability pension was not clearly erroneous.

Plaintiff also suggests that the Board's decision may have been the product of a mistake of law. According to plaintiff, the Board labored under the mistaken view that a line-of-duty pension cannot be awarded for the aggravation of a preexisting condition. Plaintiff observes that a memorandum of legal principles provided to the Board by its counsel cited cases involving pension claims by police officers. The argument is meritless. Citing Olson v. Wheaton Police Pension Board, 153 Ill. App. 3d 595 (1987), the memorandum stated that "evidence of a preexisting physical disability will not bar an award of compensation for a job-related injury caused by the 'stress of his usual labor.' " (Emphasis in original.) Whether or not Olson is applicable, the principle stated was in no way unfavorable to plaintiff. In this regard, any reliance on Olson was, at most, harmless error.

For the foregoing reasons, we dismiss the appeal in case No. 2--06--0187. We reverse the order of the circuit court dismissing case No. 05--MR--570 and, pursuant to Supreme Court Rule 366(a) (155 Ill. 2d R. 366(a)), enter judgment affirming the decision of the Board. We vacate the judgment in case No. 05--MR--44 and, pursuant to Rule 366(a), enter judgment dismissing the case for lack of jurisdiction.

No. 2--06--0133, Reversed in part and vacated in part; judgment entered.

No. 2--06--0187, Appeal dismissed.

McLAREN and HUTCHINSON, JJ., concur.