# Illinois Official Reports

## Appellate Court

***Prawdzik v. Board of Trustees of the Homer Township Fire Protection District Pension Fund*, 2019 IL App (3d) 170024**

| | |
|---|---|
| Appellate Court Caption | GREGORY PRAWDZIK, Plaintiff-Appellant, v. THE BOARD OF TRUSTEES OF THE HOMER TOWNSHIP FIRE PROTECTION DISTRICT PENSION FUND, Defendant-Appellee. |
| District & No. | Third District<br>Docket No. 3-17-0024 |
| Opinion filed upon denial of rehearing | March 27, 2019 |
| Decision Under Review | Appeal from the Circuit Court of Will County, No. 16-MR-1067; the Hon. John C. Anderson, Judge, presiding. |
| Judgment | Reversed; cause remanded. |
| Counsel on Appeal | Thomas S. Radja Jr., of Collins & Radja, of Naperville, for appellant.<br><br>Jeffrey A. Goodloe, of Puchalski Goodloe Marzullo, LLP, of Northbrook, for appellee. |
| Panel | JUSTICE HOLDRIDGE delivered the judgment of the court, with opinion.<br>Justice McDade concurred in the judgment and opinion.<br>Presiding Justice Schmidt dissented, with opinion. |

**OPINION**

¶ 1        The plaintiff, Gregory Prawdzik (Prawdzik), a former firefighter, brought an action for administrative review to the circuit court of Will County appealing the decision of the defendant, the Board of Trustees of the Homer Township Fire Protection District Pension Fund (Board), denying Prawdzik a "line of duty" disability pension. The circuit court affirmed the Board's decision. This appeal followed.

¶ 2                                                    FACTS

¶ 3        Prawdzik was employed as a firefighter for the Homer Township Fire Protection District Fire Department (District) starting on May 8, 2006. He also served in the Air National Guard.

¶ 4        In 2008-09, during his employment as a firefighter, Prawdzik was deployed for military duty in Afghanistan for a 10-month period. He was deployed to the eastern border of Afghanistan, near the border with Pakistan, where he served as a combat medic and combat advisor. The area where Prawdzik served was a thoroughfare for Taliban insurgents. Prawdzik trained, mentored, and advised a medical platoon of a battalion-sized element of the Afghan army. He accompanied his Afghan unit on combat missions approximately three to four times per week. Missions could last anywhere from several hours to one week. Prawdzik provided medical treatment to troops who later died.

¶ 5        Prawdzik testified that he encountered many life-threatening incidents while he was in Afghanistan. While on combat missions, Prawdzik was shot at approximately 10 times. Moreover, he testified that he experienced approximately 10 rocket attacks or improvised explosive device (IED) attacks. On one occasion, insurgents fired rockets at the base where Prawdzik was stationed. Prawdzik rolled out of his bunk and laid on the floor. As the rockets kept coming, someone yelled for everyone to get to the bunkers. Prawdzik thought he was going to die and was thinking about his wife and son and how they would get along without him. The rockets hit another barracks approximately 100 meters from Prawdzik's tent, killing two contractors.

¶ 6        On another occasion, a rocket attack occurred while Prawdzik was in the "chow hall." Prawdzik testified that the door bowed in, all the lights shut off, the emergency power came on, and the room was filled with dust. He felt that his life was in jeopardy. Prawdzik testified that, on another occasion, he had to "go with Afghans and interpreters through the kill zone onto the other side of the kill zone" to try to find his partner who had become separated from the rest of the unit while the unit was on patrol. During that incident, Prawdzik was under rocket-propelled grenade fire.

¶ 7        Prawdzik testified that he also experienced IED attacks. On one occasion, Prawdzik was driving in a convoy of United States military mine resistant ambush proof (MRAP) vehicles when the convoy was struck by an IED. Prawdzik heard a loud boom and "everything went black." He was thrown to the back of the vehicle and hit his head. The blow rendered him unconscious. When he came to, his vehicle was flipped upside down in a crater. Prawdzik testified that he was trapped upside down in the vehicle by a 400-pound door and he was unable to get out for over an hour. During that time, Prawdzik was afraid for his life and in fear of being attacked before he could be rescued. He suffered a head injury and was diagnosed with a traumatic brain injury.

¶ 8    Prawdzik testified that, while he was in Afghanistan, he felt as though his life was under constant threat and that he was going to die there. He did not trust the Afghans he patrolled with because he suspected that "half of them were Taliban," and there were regular reports of Afghan military or police "turning on their U.S. counterparts and shooting them." While he was getting haircuts in Afghanistan, he feared that the Afghan barber might kill him with a pair of scissors.

¶ 9    Prawdzik returned from Afghanistan and resumed working as a firefighter for the District on November 1, 2009. After he returned from Afghanistan, Prawdzik suffered from a variety of symptoms that he did not have before his deployment. For example, Prawdzik suffered from migraine headaches, panic attacks, tightness in his chest, shortness of breath, nausea, blurred (or "tunnel") vision, irritability, sadness, emotional numbness, poor concentration, insomnia, and feelings of being detached from family and friends. Prawdzik acknowledged that these were symptoms of post-traumatic stress disorder (PTSD).[1] He sought treatment through the Department of Veterans Affairs (VA). On February 9, 2010, Prawdzik showed signs of PTSD during a mental health screen, and he reported the traumatic experiences he had experienced in Afghanistan. On March 11, 2010, Dr. Thomas Benton of the VA diagnosed Prawdzik with PTSD, adjustment disorder with anxiety, and depressed mood. Dr. Benton opined that Prawdzik's PTSD symptoms (such as mild depression, passive suicidal ideation, emotional blunting, and irritability leading to verbal altercations and road rage) had increased in frequency and intensity due to "the post-military stressors of unstructured time and frustration over continuous Iraq and Afghanistan war news."

¶ 10    On March 15, 2010, Prawdzik underwent a psychiatric assessment at the VA due to "irritability with explosive outbursts." He was receiving mental health treatment from a private psychologist at that time. Prawdzik reported that he was concerned that his mental health issues might jeopardize his career with the District. The following day, Prawdzik underwent a neurological consultation during which he reported symptoms of PTSD, including sleep disturbances. The examiner opined that Prawdzik's sleep disturbances and current life stressors "may be contributing to his current cognitive inefficiencies" and that these impairments represented a "change" and a "relative reduction" in Prawdzik's abilities. The consult recommended mental health treatment.

¶ 11    The VA determined that Prawdzik's PTSD was related to his military service and awarded him VA disability benefits for PTSD, traumatic brain injury, and tinnitus. Prawdzik attended group therapy for PTSD on June 1, 2010, but did not continue with the therapy in 2010.

---

[1]PTSD is an anxiety disorder that occurs after an individual has experienced a traumatic event. More specifically, it is a psychological response to an extreme traumatic stressor involving direct personal experience of an event that involves actual or threatened death or serious injury or threat to one's physical integrity or witnessing an event that involves death, injury, or threat to the physical integrity of another person. The person's response to the event must involve intense fear, helplessness, or horror. Characteristic symptoms resulting from the exposure to the trauma include persistent re-experiencing of the trauma and numbing of general responsiveness and persistent increased symptoms of arousal. Associated features include depressed mood; anxiety and irritability; sleep disturbance; difficulty concentrating; hypervigilance; exaggerated startle response; efforts to avoid activities, places, or people that arouse recollection of the trauma; feeling detached from others; markedly diminished interest or participation in activities; and recurrent and intrusive distressing recollection of the events.

¶ 12    Prawdzik testified that he experienced panic attacks and related symptoms while on duty as a firefighter in 2009 and 2010 but that he did not report them to the District because he was hoping the situation would "resolve and take care of itself." He also experienced panic attacks when he was not on duty. While attempting to complete a driving program at work, Prawdzik was "having issues with getting in the vehicles and driving the larger vehicles." He testified that the MRAP vehicles he drove in Afghanistan were built similarly to fire department trucks in that they had the same chassis that a fire engine has, as well as the same steering column, transmission, brake system, and an identical inside cab area.

¶ 13    On July 13, 2011, Prawdzik informed the district that he suffered from PTSD. He discussed some of his experiences in Afghanistan and reported that one of the things that bothered him at work was driving the fire engine and other trucks, noting the similarity between these trucks and military vehicles. He attributed this problem to PTSD. Approximately one month later, Prawdzik met with his supervisors and discussed traumatic events that had occurred during his deployment. The District placed Prawdzik on administrative leave, ordered a fitness for duty evaluation, and required Prawdzik to complete a driving program.

¶ 14    On August 23, 2011, Dr. Tracy Rogers performed a fitness for duty evaluation for Prawdzik. Dr. Rogers noted that Prawdzik did not feel comfortable driving the fire engine or trucks because of the similarity between those vehicles and the military vehicles he drove in Afghanistan and that sitting in the cab of the fire trucks "triggers [his] PTSD symptoms." Dr. Rogers diagnosed Prawdzik with PTSD and found him conditionally fit for duty. Dr. Rogers opined that, although Prawdzik had had PTSD for the past two years, his symptoms did not appear to have affected his work performance or overall functioning. However, Dr. Rogers acknowledged that certain thoughts about trauma caused Prawdzik stress and "exacerbated [his] symptoms" and that Prawdzik was avoiding driving the fire engine and trucks because the cabs of those vehicles reminded him of the military vehicles that he drove while deployed, including the vehicle he was trapped in after receiving a head injury.

¶ 15    On August 6, 2013, Prawdzik sought mental health treatment form the VA and reported increased PTSD symptoms, including anxiety, nightmares, recurrent thoughts of trauma, feeling watchful and getting easily startled, and feelings of numbness and detachment. He reported that his recent increase in anxiety symptoms was triggered mostly by a stressful work environment. Specifically, he felt scrutinized at work because the District had a new chief who was writing people up, demoting them, and firing them. He also stated that his PTSD symptoms were exacerbated by driving the rigs at work, although he had passed the driving program ordered by his supervisors. The social worker who evaluated Prawdzik opined that PTSD symptoms may be perpetuated by the "trauma of war" and that Prawdzik's symptoms were impacted by "occupational stress" and "parenting stress."

¶ 16    On September 3, 2013, Prawdzik began therapy for PTSD and marital issues. During a September 11, 2013, session, he reported that he was "triggered at work when driving large trucks or hearing loud noises" and that he tended to be hypervigilant and "extra worried about safety issues." He discussed the many combat traumas he had experienced. On September 27, 2013, Dr. Pradipkumar Desai examined Prawdzik at the VA for anxiety and depression. Dr. Desai noted that Prawdzik's reduction in alcohol consumption had "significantly" reduced his PTSD symptoms, but also noted that Prawdzik's mood was sad and anxious. Dr. Desai diagnosed Prawdzik with PTSD exacerbated by physical stressors. Prawdzik testified that the stress and anxiety he was treated for in 2013 were a continuation of the PTSD symptoms he

had been experiencing since 2009, that his PTSD was "from Afghanistan," and that his doctors had told him that he would have these symptoms for the rest of his life.

¶ 17    On June 20 and September 20, 2014, Dr. Desai examined Prawdzik again for PTSD. During both sessions, Prawdzik presented with depressed mood and reported that he was suffering from "nightmares and flashbacks." During his August 18, 2014, District physical, Prawdzik reported that he had experienced weakness and fatigue, as well as persistent anxiety, lack of concentration, and insomnia during the past few months. He later testified that the effects of the war were taking a toll on his mental health in 2013 and 2014.

¶ 18    On November 7, 2014, Prawdzik was working full duties as a firefighter when he was dispatched to an emergency call. On the way back from the call, the fire truck Prawdzik was driving was shifting roughly between gears. As Prawdzik tried to check the pump shift lever to fix the problem, he inadvertently hit the power switch, shutting off all the power in the vehicle while the vehicle was traveling at approximately 45 miles per hour. This reminded Prawdzik of his experience in Afghanistan when his vehicle was hit by an IED, and it gave Prawdzik the feeling that he was going to die. Prawdzik testified that he had an anxiety attack after the November 7, 2014, incident and that his PTSD symptoms of anxiety got progressively worse thereafter. For example, Prawdzik stated that, over the next few days, he began to feel tightness in his chest, blurred vision, shortness of breath, and was having trouble concentrating. However, Prawdzik admitted that he may have been having increasing anxiety prior to the November 7, 2014, incident. Prawdzik did not report having a panic attack on November 7, 2014.

¶ 19    On November 16, 2014 (two duty shift days after the November 7, 2014, incident), Prawdzik reported the issues he was having with PTSD and asked to go home. He was placed on modified duty and never returned to full, unrestricted duty thereafter. During the three years prior to the November 7, 2014, incident, Prawdzik had been able to perform his full, unrestricted firefighter duties despite his PTSD.

¶ 20    Prawdzik underwent another fitness for duty evaluation on November 21, 2014. At that time, Prawdzik reported experiencing anxiety symptoms (including a panic attack that occurred during the November 7, 2014, work incident), but he denied experiencing any symptoms of PTSD aside from generalized anxiety. The evaluator (Dr. Wasyliw) noted that Prawdzik did not associate his anxiety symptoms with his "service-connected" experiences, and that Prawdzik had problems on the job only when driving trucks reminiscent of those he drove in Afghanistan. Dr. Wasyliw concluded that Prawdzik was unable to drive fire trucks due to his anxiety issues. Because it is a necessary requirement of Prawdzik's employment that he be able to drive all Department vehicles at any time, Dr. Wasyliw found Prawdzik unfit for duty. Dr. Wasyliw opined that the claimant was unfit for duty due to "generalized anxiety disorder with residual PTSD symptoms and a major depressive episode." Dr. Wasyliw noted that Prawdzik had been experiencing increasing "generalized" anxiety for a few days in early November, which "became worse" after the November 7, 2014, work incident, when the power went out in the truck the claimant was driving. Dr. Wasyliw opined that Prawdzik's anxiety disorder was "more widespread" at the time of his November 21, 2014, evaluation than it had been when the claimant underwent a previous fitness for duty evaluation in 2011. Although Dr. Wasyliw "could not uncover any specific precipitants or stressors" that triggered Prawdzik's increased anxiety during the week prior to the November 7, 2014, incident, Dr. Wasyliw noted that (1) Prawdzik had "report[ed] a number of long standing physical

symptoms that may have a medical basis" and (2) Prawdzik had recently begun taking a new medication for a urinary condition and it "needs to be assessed" whether the new medication was contributing to Prawdzik's anxiety and depression.

¶ 21 Thereafter, Prawdzik continued to undergo mental health treatment for PTSD. His mental health records indicate that he continued to experience PTSD symptoms, including panic attacks while driving and during other situations. A May 2015 fitness for duty evaluation concluded that Prawdzik's panic attacks could occur at any time and were not related to any specific situation. On April 17, 2015, Prawdzik reported increased panic attacks and was placed on administrative leave. A June 3, 2015, PTSD assessment at the VA concluded that (1) Prawdzik's job duties as a firefighter resembled his service-related traumas, which have "contributed to his PTSD symptoms relapse," and (2) it is more likely than not that Prawdzik's "current level of social and occupational impairment due to his PTSD symptoms remains similar to that reported on his last PTSD evaluation dated March 11, 2010."

¶ 22 On June 18, 2015, Prawdzik filed an application for disability benefits with the Board. Pursuant to section 4-112 of the Illinois Pension Code (Code) (40 ILCS 5/4-112 (West 2014)), the Board had Prawdzik evaluated by three physicians of its choosing: Dr. Robert Reff, Dr. Stevan Weine, and Dr. Cathy Frank.

¶ 23 Dr. Reff opined that Prawdzik suffers from generalized anxiety disorder with residual post-traumatic symptoms. Dr. Reff concluded that this condition prevented Prawdzik from functioning as a firefighter because it limits his ability to drive large vehicles, including fire trucks and engines. Although Dr. Reff acknowledged that Prawdzik's preexisting PTSD and anxiety disorder was caused by his combat experiences in Afghanistan, he opined that Prawdzik's *disability* from PTSD was, at least in part, the result of his firefighter duties. Dr. Reff explained:

> "It is my opinion that Mr. Prawdzik suffers from a disability resulting from an act of duty. After completing the sixth month Corrective Plan established by Dr. Rogers in September 2011, it appears as if Mr. Prawdzik was able to perform adequately as a firefighter/paramedic, including driving as required. It was not until [the November 7, 2014, incident] that Mr. Prawdzik experienced performance limiting anxiety again. *** Mr. Prawdzik's current episode would be considered an aggravation of his pre-existing psychiatric condition, more likely than not, caused by the incident that occurred on November 7, 2014."

Dr. Reff further opined that Prawdzik's current disability was "permanent" based upon the length of time that Prawdzik had suffered some degree of symptoms and "the significance of symptoms he suffered following the [November 7, 2014] incident."

¶ 24 Dr. Weine opined that Prawdzik was disabled and suffered from chronic PTSD, recurrent major depression, and isolated traumatic stress symptoms. Dr. Weine concluded that, over time, Prawdzik's PTSD symptoms had diminished to the point where he no longer meets the formal diagnostic criteria for PTSD, but he continues to suffer from generalized anxiety disorder and major depressive disorder. Dr. Weine opined that (1) "the persistence and worsening" of Prawdzik's disorders was due to his "exposure to stress as a firefighter/EMS" and (2) "[Prawdzik's] conditions were initially caused by his combat exposure in Afghanistan but were exacerbated by the stress of firefighter work."

¶ 25 Dr. Frank opined that Prawdzik's PTSD prevented him from driving firefighting vehicles, which was an essential part of his job. She concluded that Prawdzik's exposure to trauma on

the job "continues to aggravate his PTSD causing anxiety, hypervigilance, insomnia, and panic attacks," and "as long as [Prawdzik] continues to drive the fire fighting/paramedic vehicles required for his employment, he will continue to have aggravation of his PTSD." However, Dr. Frank opined that it was Prawdzik's combat exposure, and not any incident or trauma in his employment, that caused his PTSD and major depressive disorder. According to Dr. Frank, "[c]ues" from Prawdzik's employment (such as accidentally turning off the power while driving a fire engine on November 7, 2014, or driving work-related vehicles generally) "may aggravate his PTSD at times, but are not the cause of this disorder."

¶ 26    The Board issued a written order granting Prawdzik a "non-duty" disability pension pursuant to section 4-111 of the Code but denying him a "line of duty" disability pension pursuant to section 4-110. The Board found that Prawdzik was entitled to a "non-duty" disability pension because he was "mentally permanently disabled for service in the fire service" as a result of the "sickness" of PTSD.

¶ 27    However, the Board denied Prawdzik a "line of duty" disability pension because it found that the disabling sickness (*i.e.*, Prawdzik's PTSD) was not "incurred in and did not result from the performance of an act of duty or the cumulative effects acts of duty." In support of this finding, the Board relied upon Dr. Frank's opinion and other evidence purportedly suggesting that Prawdzik's PTSD was not "caused by" the November 7, 2014, work incident or by Prawdzik's general firefighting duties. The Board noted that several doctors had diagnosed Prawdzik with PTSD years before the November 2014 incident and had linked the etiology of Prawdzik's PTSD with the traumatic experiences he suffered in Afghanistan. The Board further noted that the claimant had experienced symptoms of PTSD, including panic attacks, both before and after the November 2014, incident, and that Dr. Wasyliw opined in 2015 that the claimant's panic attacks "could occur at any time" and "were not related to any specific situation."[2] Moreover, the Board stressed that Prawdzik "was already experiencing increased anxiety in the weeks leading up to the November 7, 2014, incident," and it cited Dr. Wasyliw's inability to "uncover any specific precipitants or stressors" associated with that increased anxiety. Relying on Dr. Frank's opinion, the Board found that the November 7, 2014, incident had merely *triggered symptoms* of Prawdzik's preexisting PTSD but did not *cause* his PTSD.

¶ 28    The Board also found that there was no evidence to support Prawdzik's claim that his disabling PTSD was caused by his performance of "general firefighting/EMS duties." The Board noted that Prawdzik was always able to perform general firefighting and EMS duties (including fire rescue, fire suppression, and EMS duties), "albeit with driving restrictions," both before and after the November 7, 2014, incident. The Board also rejected any such claim as a matter of law. Relying upon our appellate court's decision in *Graves v. Pontiac Firefighters' Pension Board*, 281 Ill. App. 3d 508, 515 (1996), the Board ruled that, even if there were evidence to support Prawdzik's claim that general firefighting and EMS duties caused his PTSD, the claim would fail because "stress or depression resulting from general employment functions inherent in the occupation and common to all firefighters is not the equivalent of the specific acts of duty contemplated by section 4-110" of the Code.

---

[2]The Board acknowledged that, during his November 2014 fitness for duty evaluation, Prawdzik denied almost all symptoms of PTSD. However, the Board found these denials to be "false in light of the record."

¶ 29    The Board concluded that the "underlying cause" of the claimant's disabling PTSD was "external to, and independent of, any specific act of duty or to the cumulative effects of acts of duty." It denied Prawdzik's claim for a "line of duty" pension on that basis.

¶ 30    Prawdzik filed a complaint for administrative review of the Board's decision in the circuit court of Will County. The circuit court affirmed the Board's decision. In its written order, the circuit court stated that, "[h]ad the [court] been a member of the administrative board, the [court] might have reached a different conclusion." However, the circuit court found that, "regardless of which standard of review is applied, the Court must find that the record does not justify reversal."

¶ 31    This appeal followed.

¶ 32                                              ANALYSIS

¶ 33    Prawdzik appeals the Board's denial of a line of duty disability pension. Before addressing the issues raised by Prawdzik, we note that Prawdzik's brief on appeal does not comply with the requirements of Illinois Supreme Court Rule 342(a) (eff. Jan. 1, 2005). That rule provides, in relevant part, that

> "[t]he appellant's brief shall include, as an appendix, *** a copy of the judgment appealed from, [and] any opinion, memorandum, or findings of fact filed or entered by the trial judge *or by any administrative agency or its officers*. (Emphasis added.) Ill. S. Ct. R. 342(a) (eff. Jan. 1, 2005).

Although Prawdzik included a copy of the circuit court's order in his appendix, he failed to include a copy of the Board's decision, in violation of Rule 342(a). Moreover, the table of contents to the record on appeal included in Prawdzik's appendix does not state the names of all witnesses and the pages on which their testimony begins, as required by Rule 342(a).

¶ 34    When a brief or appendix fails to follow the requirements set forth in Rule 342(a), we may dismiss the appeal. *Perez v. Chicago Park District*, 2016 IL App (1st) 153101, ¶ 8. We admonish Prawdzik's counsel that our supreme court's rules are not advisory suggestions but mandatory rules that must be followed. *In re Marriage of Hluska*, 2011 IL App (1st) 092636, ¶ 57. Because the parties included citations to the relevant record materials in their briefs on appeal, Prawdzik's violation of Rule 342(a) has not precluded meaningful review of the Board's decision in this case. Accordingly, although we have the discretion to dismiss this appeal, we elect to address the issues Prawdzik raises on their merit. However, we admonish Prawdzik's counsel, and all appellants, to ensure that their briefs on appeal are in full compliance with Rule 342(a).

¶ 35    Turning to the merits, we begin by identifying the standards of review governing our analysis. We review the Board's decision, not the circuit court's determination. *Village of Oak Park v. Village of Oak Park Firefighters Pension Board*, 362 Ill. App. 3d 357, 365 (2005). The factual findings of an administrative agency are deemed *prima facie* true and correct (735 ILCS 5/3-110 (West 2016)) and may be reversed only if they are against the manifest weight of the evidence (*Hammond v. Firefighters' Pension Fund*, 369 Ill. App. 3d 294, 307 (2006)). Accordingly, we review the Board's findings of fact regarding the nature of the plaintiff's emotional condition and its cause deferentially and will overturn such findings only if they are against the manifest weight of the evidence. *Id.*

¶ 36    An agency's decision is against the manifest weight of the evidence only if the opposite conclusion is clearly evident. *Carrillo v. Park Ridge Firefighters' Pension Fund*, 2014 IL App (1st) 130656, ¶ 21. The mere fact that an opposite conclusion is reasonable or that the reviewing court might have ruled differently will not justify reversal of the Board's decision. *Robbins v. Board of Trustees of the Carbondale Police Pension Fund*, 177 Ill. 2d 533, 538 (1997); *Carrillo*, 2014 IL App (1st) 130656, ¶ 21. If the record contains evidence supporting the agency's decision, the decision should generally be affirmed. *Marconi v. Chicago Heights Police Pension Board*, 225 Ill. 2d 497, 534 (2006); *Robbins*, 177 Ill. 2d at 538. It is particularly within the Board's province to accord weight to the evidence, resolve conflicts presented by the evidence, and determine the credibility of witnesses. *Peterson v. Board of Trustees of the Firemen's Pension Fund*, 54 Ill. 2d 260, 263 (1973); *Evert v. Board of Trustees of the Fire Fighters' Pension Fund*, 180 Ill. App. 3d 656, 660 (1989). A reviewing court may not reweigh the evidence or make an independent determination of the facts. *Hoffman v. Orland Firefighters' Pension Board*, 2012 IL App (1st) 112120981, ¶ 18.

¶ 37    However, the deference we afford the Board's decision is "not boundless." *Wade v. City of North Chicago Police Pension Board*, 226 Ill. 2d 485, 507 (2007); see also *Scepurek v. Board of Trustees of the Northbrook Firefighters' Pension Fund*, 2014 IL App (1st) 131066, ¶ 26; *Bowlin v. Murphysboro Firefighters Pension Board of Trustees*, 368 Ill. App. 3d 205, 210-12, (2006) ("our review cannot amount to a rubber stamp of the proceedings below"). " 'Even when the decision is supported by some evidence, which if undisputed would sustain the administrative finding, it is not sufficient if upon consideration of all the evidence the finding is against the manifest weight.' " *Scepurek*, 2014 IL App (1st) 131066, ¶ 26 (quoting *Bowlin*, 368 Ill. App. 3d at 211-12).

¶ 38    "[W]hether the facts, as found by the Board, satisfy the standard for awarding a line-of-duty disability pension" is a mixed question of law and fact subject to the clearly erroneous standard of review. *Hammond*, 369 Ill. App. 3d at 307. This is a less deferential standard than the manifest weight of the evidence standard, yet still "significantly deferential." (Internal quotation marks omitted.) *Carrillo*, 2014 IL App (1st) 130656, ¶ 21. Under this standard, we should affirm the Board's decision unless, after reviewing the entire record, we are left with a definite and firm conviction that a mistake has been committed. *Hammond*, 369 Ill. App. 3d at 307; *Carrillo*, 2014 IL App (1st) 130656, ¶ 21. Pure questions of law (such as the proper interpretation of a statute) are reviewed *de novo*. *Robbins*, 177 Ill. 2d at 538; *Village of Oak Park*, 362 Ill. App. 3d at 365.

¶ 39    The section of the Code addressing line of duty disability pensions provides, in relevant part:

> "If a firefighter, as the result of sickness, accident or injury *incurred in or resulting from the performance of an act of duty or from the cumulative effects of acts of duty*, is found, pursuant to Section 4-112, to be physically or mentally permanently disabled for service in the fire department, so as to render necessary his or her being placed on disability pension, the firefighter shall be entitled to a [line of duty] disability pension ***." (Emphasis added.) 40 ILCS 5/4-110 (West 2014).

Section 6-110 of the Code (40 ILCS 5/6-110 (West 2014)) defines "act of duty" as:

> "Any act imposed on an active fireman by the ordinances of a city, or by the rules or regulations of its fire department, or any act performed by an active fireman while on

duty, having for its direct purpose the saving of the life or property of another person." 40 ILCS 5/6-110 (West 2014).[3]

¶ 40    To recover a line of duty disability pension, a claimant need not prove that his job duties were the "sole or even the primary cause" of his disability"; rather, it is sufficient that an act of duty was an "aggravating, contributing or exacerbating factor" in the ensuing disability. *Edwards v. Addison Fire Protection District Firefighters' Pension Fund*, 2013 IL App (2d) 121262, ¶ 32; see also *Village of Oak Park*, 362 Ill. App. 3d at 371. The claimant must only prove that the duty-related injury is a "causative factor contributing to the claimant's disability." (Internal quotation marks omitted.) *Scepurek*, 2014 IL App (1st) 131066, ¶ 27; see also *Carrillo*, 2014 IL App (1st) 130656, ¶ 23. "There is no requirement that the duty-related incident be the originating or primary cause of injury, although a sufficient nexus between the injury and the performance of the duty must exist." (Internal quotation marks omitted.) *Scepurek*, 2014 IL App (1st) 131066, ¶ 27. Accordingly, " '[a] disability pension may be based upon the line-of-duty aggravation of a preexisting condition.' " *Id.* (quoting *Wade*, 226 Ill. 2d at 505); see also *Carrillo*, 2014 IL App (1st) 130656, ¶ 23.

¶ 41    In this case, two of the three physicians chosen by the Board (Drs. Reff and Weine) expressly opined that Prawdzik's work duties, including the November 7, 2014, work incident, aggravated or exacerbated Prawdzik's preexisting psychological conditions, resulting in Prawdzik's disability (*i.e.*, his inability to continue working as a firefighter). Dr. Reff opined that Prawdzik's disability was caused by an "act of duty" (specifically, the November 7, 2014, work incident). Similarly, although Dr. Weine acknowledged that Prawdzik's PTSD was initially caused by his combat exposure, he opined that "the persistence and worsening" of Prawdzik's disabling psychological disorders was due to his "exposure to stress as a firefighter/EMS."[4]

¶ 42    Although the third physician chosen by the Board, Dr. Frank, did not explicitly opine that Prawdzik's disability was caused in whole or in part by the November 7, 2014, incident, she acknowledged that driving fire trucks "aggravated" Prawdzik's PTSD, which was the cause of his disability. Dr. Frank's opinion focuses primarily on the "cause" of Prawdzik's PTSD. She concludes that Prawdzik's "combat exposure, and not any incident or trauma in his employment with [the District] is the cause of his PTSD." However, this means only that, in Dr. Frank's opinion, Prawdzik's PTSD *originated from* his combat exposure. Dr. Frank did not deny that certain acts of duty connected to Prawdzik's employment *aggravated or exacerbated* Prawdzik's PTSD in a manner that contributed to Prawdzik's current disability. To the

---

[3]This provision appears in the Code section governing municipalities of 500,000 people or more. There is no definition of "act of duty" in the section of the Code applying to firefighters in municipalities with populations of 500,000 and under. However, our appellate court has held that section 6-110's definition "applies equally to all firefighters" in Illinois. *Mabie v. Village of Schaumburg*, 364 Ill. App. 3d 756, 759 (2006); *Jensen v. East Dundee Fire Protection District Firefighters' Pension Fund Board of Trustees*, 362 Ill. App. 3d 197, 204 (2005).

[4]Dr. Weine opined that Prawdzik had previously suffered from PTSD but "no longer me[t] the formal diagnostic criteria for PTSD" at the time Dr. Weine issued his IME report in November 2015. However, Dr. Weine opined that (1) Prawdzik continued to suffer from generalized anxiety disorder, major depressive disorder, and "isolate traumatic stress symptoms," all of which were initially caused by Prawdzik's combat exposure in Afghanistan but "were exacerbated by the stress of firefighter work," and (2) these conditions were the cause of Prawdzik's disability.

contrary, Dr. Frank acknowledged that the exposure to trauma on the job "continue[d] to aggravate [Prawdzik's] PTSD causing anxiety, hypervigilance, insomnia, and panic attacks" and that Prawdzik "will continue to have aggravation of his PTSD" as long as he continues to drive the firefighting vehicles required for his employment. Accordingly, Dr. Frank did not deny (and, in fact, appeared to admit) that the aggravated PTSD symptoms that disabled Prawdzik from working were triggered by the performance Prawdzik's essential job duties.[5]

¶ 43    Further, Prawdzik testified that his PTSD symptoms became more severe after the November 7, 2014, incident, and the record shows that he was able to perform his job duties as a firefighter until shortly after the November 7, 2014, incident. Only after that incident was he permanently disabled from performing the essential functions of his job.

¶ 44    Thus, the manifest weight of the evidence establishes that Prawdzik's psychological disability was caused, at least in part, by his work duties. Prawdzik's work duties causally contributed to his disability by aggravating the symptoms of his underlying PTSD and/or generalized anxiety disorder to the point where these disorders became permanently disabling.

¶ 45    The Board raises two main arguments in defense of its decision. First, the Board argues that Prawdzik's claim is governed by a stricter causation standard because Prawdzik alleges a mental or psychological injury rather than a physical injury. As noted, Prawdzik maintains that he is entitled to a line of duty disability pension if he can show that his employment duties were a causal factor (*i.e.*, a contributing cause, but not necessarily the sole or original cause) in his disability. The Board concedes that this standard applies in line of duty disability cases involving *physical* injuries. However, the Board argues that the Illinois Supreme Court has rejected the "causal factor" standard for line of duty disability cases involving *mental or psychological* disabilities. Specifically, the Board maintains that in *Robbins*, 177 Ill. 2d 533, our supreme court held that in cases involving mental disabilities, the claimant must prove that an act of duty was the *sole* cause of his disabling injury, not merely a contributing cause.

¶ 46    The Board reads *Robbins* too broadly. As an initial matter, *Robbins* involved a line of duty disability pension application filed by a police officer, not a firefighter. The Code defines "act of duty" very differently for police officers than for firefighters. See *Jensen*, 362 Ill. App. 3d at 203. For police officers, the Code defines "act of duty" as any act of police duty "inherently involving special risk, not ordinarily assumed by a citizen in the ordinary walks of life" that is imposed on a policeman by statutes, ordinances, or regulations, or "any act of heroism *** having for its direct purpose the saving of a life or property of a person other than the policeman." 40 ILCS 5/5-113 (West 2014). For firefighters, by contrast, the Code defines "act of duty" far more broadly to include "[a]ny act imposed on an active fireman by the ordinances of a city, or by the rules or regulations of its fire department, or any act performed by an active fireman while on duty, having for its direct purpose the saving of the life or property of another person." 40 ILCS 5/6-110 (West 2014). These divergent statutory definitions of "act of duty" entail different standards for awarding "line of duty" disability pensions to police officers as compared to firefighters. See *Jensen*, 362 Ill. App. 3d at 203 (reversing Board's denial of a line

_____

[5]Nor did Dr. Wasyliw deny that Prawdzik's work duties aggravated or exacerbated his symptoms in a way that contributed to his disability. To the contrary, Dr. Wasyliw acknowledged that the increasing "generalized" anxiety that Prawdzik had been experiencing for a few days in early November "became worse" after the November 7, 2014, work incident, and he opined that Prawdzik's anxiety disorder was "more widespread" at the time of his November 21, 2014, evaluation than it had been in 2011.

of duty disability pension to a firefighter where the Board erroneously applied the definition of "act of duty" applicable to police officers). To establish eligibility for a line of duty pension under the stricter standard prescribed for police officers, a police officer must establish that his disability is "the result of a specific, identifiable act of duty unique to police work." (Internal quotation marks omitted.) *Robbins*, 177 Ill. 2d at 542. Accordingly, when a police officer alleges a psychological or mental disability caused by job-related stress, he may obtain a line of duty pension only if he proves that "the causes of the stress are *** unique to police work." (Internal quotation marks omitted.) *Id.*; see also *id.* ("to be eligible for a line-of-duty disability pension based on stress, a police officer's psychological disability must result from a special risk, not ordinarily assumed by a citizen in the ordinary walks of life" (internal quotation marks omitted)). In other words, the stress alleged to be disabling must result *entirely* from a specific, identifiable act of duty that is unique to police work and that involves a special risk not confronted by members of the general public. This rule flows directly from the definition of "act of duty" for police officers prescribed by section 5-113 of the Code. *Id.* (noting that the requirement that the causes of stress be unique to police work is "an outgrowth of judicial attempts to define and apply [section 5-113's] term 'act of duty' to cases involving claimed psychological disabilities" (internal quotation marks omitted)).

¶ 47    Applying this standard, our supreme court upheld the Board's denial of a line of duty pension to the claimant police officer in *Robbins* because the "record contain[ed] ample evidence that [Officer] Robbins' stress was the result of his anxiety over his job performance, which civilians regularly suffer, and not the performance of a specific act of duty" unique to police work. *Id.* at 544. Each of the psychologists who testified in the case opined that, while Officer Robbins's disabling stress was related to his police work, it "was not connected to any specific act of Robbins as a police officer"; rather, the stress was triggered by general features of his employment, such as the pace of his job duties. *Id.*[6] Our supreme court held that this type of generalized job stress did not entitle Officer Robbins to a line of duty pension given the Code's strict definition of "act of duty" for police officers. See *id.* at 542 (applying section 5-113's definition of "act of duty" and ruling that, where the alleged psychological disability is "traceable only to the general nature of being a police officer and not to a specific act of police service," and the causes of stress are not unique to police work, "line-of-duty disability pensions are *** denied" (internal quotation marks omitted)).

¶ 48    In so holding, our supreme court reversed our appellate court's judgment in *Robbins*, which had reversed the Board's denial of benefits based on common-law tort conceptions of causation. *Id.* at 543-44. The appellate court did not address section 5-113's definition of "act of duty" for police officers or the limitations on line of duty pensions that that definition entails. *Id.* at 543. Rather, the appellate court focused its analysis upon the Code's phrase "incurred in or resulting from the performance of an act of duty." (Internal quotation marks omitted.) *Id.* The appellate court reasoned that the words "incur" and "resulting from" were equivalent to the word "cause." *Id.* It then reasoned that the tort concept of proximate cause allows for more than one cause of an injury. *Id.* Thus, the appellate court concluded that a disabled police officer should not be deprived of a line of duty disability pension as long as one

---

[6]Although Officer Robbins argued that his disabling stress was caused, at least in part, by a work-related incident during which he saw a man commit suicide with a shotgun, none of the medical opinions supported this argument. *Robbins*, 177 Ill. 2d at 544.

of the causes of the disability resulted from an act of duty. *Id.* The appellate court awarded Officer Robbins a line of duty disability pension based on "generalized police stress of multiple origins" because it concluded that "Robbins' debilitating mental condition was caused, at least in part, by his on-duty functions as a police officer." (Internal quotation marks omitted.) *Id.* Our supreme court rejected the appellate court's reasoning and its conclusion. Noting that the case before it was "a statutory action with explicit requirements and not a common law negligence action," the supreme court ruled that the appellate court had erred by basing its conclusion on the common law concepts of negligence and proximate cause rather than on the plain and unambiguous language of the Code, which required that the disability result from an "act of duty" as defined by section 5-113. *Id.* at 543-44.

¶ 49    The Board argues that *Robbins*'s rejection of a tort-based standard of causation should not be limited to pension disability claims brought by police officers but should also apply to a firefighter's claim for a line of duty pension based on psychological disabilities. In its petition for rehearing, the Board assumes that our supreme court's holding in *Robbins* was based entirely upon the supreme court's construction of the statutory phrase "incurred in or resulting from" the performance of an act of duty (which applies to line of duty disability claims filed by firefighters as well as police officers) and had nothing to do with section 5-113's definition of "act of duty" (which applies only to police officers). Based on this assumption, the Board contends that our original order in this case "incorrectly focused on the different *** definitions of the phrase 'act of duty' in the line of duty disability statutes whereas the Court should have focused on the Supreme Court's interpretation of the phrase 'incurred in or resulting from' found in both line of duty disability statutes." The Board maintains that "there is no compelling reason, statutory or otherwise, why police officers and firefighters should have a different causation standard for line of duty mental disability pensions when the operable [causation] language in the [two] statutes" (*i.e.*, the phrase "incurred in or resulting from") "is identical."

¶ 50    We disagree. Contrary to the Board's assertion, the "operable causation language" in the two statutes is not identical. Although both statutes contain the phrase "incurred in or resulting from an act of duty," they define "act of duty" very differently. Because each statute authorizes a line of duty disability pension only for disabling injuries resulting from an "act of duty," the causation standard prescribed by each statute is linked to that statute's definition of "act of duty." Because each statute defines "act of duty" differently, the corresponding causation standards must differ accordingly. Our supreme court recognized this fact in *Robbins*. The supreme court's rejection of the tort-based standard of causation in *Robbins* was based entirely on section 5-113's narrow definition of "act of duty," which requires that the disabling stress be caused *entirely* by an identifiable act of duty unique to police work and involving a special risk not ordinarily assumed by civilians (thereby precluding any common law, tort-based conception of contributing cause). The definition of "act of duty" applicable to line of duty claims filed by firefighters includes no comparable restriction. See 40 ILCS 5/6-110 (West 2014). Accordingly, unlike a police officer, a firefighter seeking a line of duty disability pension may establish that his disability is caused by an "act of duty" even if work-related stress was a contributing cause, rather than the sole cause, of his disabling psychological condition. See, *e.g.*, *Edwards*, 2013 IL App (2d) 121262, ¶ 32 (a firefighter may recover a line of duty disability pension by showing that an act of duty was an "aggravating, contributing or exacerbating factor" in the ensuing disability without having to prove that his job duties were

the "sole or even the primary cause" of his disability); see also *Wade*, 226 Ill. 2d at 505; *Carrillo*, 2014 IL App (1st) 130656, ¶ 23; *Scepurek*, 2014 IL App (1st) 131066, ¶ 27; *Village of Oak Park*, 362 Ill. App. 3d at 371.[7]

¶ 51    In its petition for rehearing, the Board accuses us of making the "same error as the appellate court in *Robbins*." To the contrary, it is the Board that employs the same flawed reasoning applied by the appellate court in *Robbins*, which our supreme court explicitly rejected. Like the appellate court in *Robbins*, the Board focuses its causation analysis entirely on the phrase "incurred in or resulting from" rather than on section 5-113's definition of "act of duty." It is the latter, not the former, that our supreme court treated as dispositive.

¶ 52    In sum, the Board misconstrues *Robbins*. *Robbins* did not impose a different causation standard for firefighters alleging psychological disabilities. Nor did *Robbins* eliminate or limit the traditional causal factor standard in a way that would apply in this case. Although the *Robbins* court rejected the appellate court's reliance on tort-based standards of causation (including the principle that any act of duty that contributes to the disability is a "cause" of the disability), it did so because the appellate court had failed to apply the governing statutory definition of "act of duty" for police officers. *Robbins* does not hold or imply that the "causal factor" test should not apply to mental disability claims brought by *firefighters* seeking line of duty disability pensions. See generally *Jensen*, 362 Ill. App. 3d at 203. Nor does *Robbins* hold or imply that, to obtain a line of duty disability pension, a firefighter must prove that some act of duty was the "sole" or "original" cause of his mental or psychological disability. If a firefighter can show that some "act of duty" (as defined by section 6-110, which applies to firefighters rather than policemen) causally contributed to his disabling mental condition, he may recover a line of duty pension. As noted above, Prawdzik has made that showing.

¶ 53    The Board also argues that the evidence does not support Prawdzik's claim that the November 7, 2014, incident (or any other act of duty) caused or aggravated his PTSD symptoms to the point that they became disabling. The Board stresses that each of the evaluating doctors (plus many of Prawdzik's treaters as well as Prawdzik himself) opined that Prawdzik's PTSD was caused by his combat trauma in Afghanistan, and it argues that Prawdzik's job duties merely "triggered symptoms" of his PTSD. Moreover, the Board notes that the medical records show that Prawdzik's PTSD symptoms were worsening in 2013 and 2014, prior to the November 7, 2014, incident. Further, Prawdzik admitted that he may have been having increasing anxiety prior to the November 7, 2014, incident, and the medical records show that to be the case.

¶ 54    We do not find these arguments persuasive. Although there is some evidence in the record suggesting that Prawdzik's PTSD and anxiety symptoms were worsening shortly before the November 7, 2014, incident, it is undisputed that Prawdzik was able to work full duty without significant restrictions until shortly after the November 7, 2014, incident. It was not until after

---

[7]Each of these cases involved claims for physical disabilities. The Board argues that *Robbins*'s stricter causation standard should apply to firefighter pension disability claims based on psychological disabilities. However, to paraphrase a statement made by the Board in another context, "there is no compelling reason, statutory or otherwise" why firefighter pension disability claims predicated on psychological disabilities should be governed by a different causation standard than similar claims predicated on physical disabilities. The Board's only argument for this proposition is its contention that *Robbins* requires it. As shown above, that is not the case.

that incident that Prawdzik's symptoms became permanently disabling. Prawdzik testified that his PTSD symptoms became more severe after the November 7, 2014, incident. The medical opinions of Drs. Reff, Weine, Wasyliw, and Frank either support this testimony or, at a minimum, do not contradict it. Moreover, the medical records and some of the medical opinions suggest that the aggravation of Prawdzik's symptoms in 2013 and 2014 (prior to the November 7, 2014, incident) was itself due, at least in part, to acts of duty such as driving fire trucks, which reminded Prawdzik of his combat exposure.

¶ 55    The Board relies extensively upon our appellate court's decisions in *Hammond*, 369 Ill. App. 3d 294, and *Graves*, 281 Ill. App. 3d 508. Neither decision supports the Board's argument in this case. In *Hammond*, our appellate court affirmed the denial of a line of duty disability pension to a firefighter where there was evidence suggesting that certain acts of duty had merely triggered symptoms of an underlying psychological condition that was causally unrelated to the firefighter's job. Here, by contrast, the evidence established that certain acts of duty (including a traumatic work incident on November 7, 2014), causally contributed to Prawdzik's disability by aggravating the symptoms of his underlying psychological disorder and rendering it disabling.[8]

¶ 56    The Board's reliance on *Graves* is also unavailing. As an initial matter, *Graves* appears to apply an erroneous causation standard. The *Graves* court held that a firefighter's "general job dissatisfaction or job stress arising from the inability to handle general duties does not give rise to a duty-related disability pension." *Graves*, 281 Ill. App. 3d at 515. The court further ruled that, even where general aspects of a firefighter's duties cause or contribute to a psychological disability, "stress or depression resulting from general employment functions inherent in the occupation and common to all firefighters [is] not the equivalent of the specific acts of duty contemplated by the statute." *Id.* In crafting this definition of "act of duty," *Graves* relied on cases involving the definition of "act of duty" applicable to police officers. However, our appellate court subsequently held that that definition does not apply in pension cases involving firefighters. *Jensen*, 362 Ill. App. 3d at 203-04. Thus, "it is not entirely clear *** whether *Graves* is still good law." *Hammond*, 369 Ill. App. 3d at 307.

¶ 57    In any event, the instant case is distinguishable from *Graves*. Here, Prawdzik presented evidence of a specific, work-related traumatic incident (the November 7, 2014, incident) that aggravated his preexisting symptoms and rendered his preexisting psychological condition permanently disabling. Unlike the claimant in *Graves*, Prawdzik did not base his claim entirely upon allegations of stress or depression resulting from general employment functions.

---

[8]Contrary to the Board's assertion in its petition for rehearing, the *Hammond* court did not hold that an act of duty (or the cumulative effects of any acts of duty) aggravated the symptoms of the plaintiff's underlying psychological condition, rendering it disabling. To the contrary, the court upheld the Board's finding that the plaintiff's disability "stemmed from interpersonal difficulties" rather than the plaintiff's job duties. *Hammond*, 369 Ill. App. 3d at 307. The Board's finding in *Hammond* was based, in part, on the opinion of Dr. Harris, an independent psychiatrist who evaluated the plaintiff. According to Dr. Harris, the plaintiff was disabled due to several preexisting psychological problems that were unrelated to the plaintiff's work duties, and the claimant's disability "was not duty related." *Id.* at 301. This refutes the Board's assertion in its petition for rehearing that "every doctor in *Hammond* found that an 'act of duty' or the 'cumulative effects of acts of duty' as a firefighter in some way caused or contributed to the worsening of the plaintiff's mental condition such that he became disabled."

- 15 -

¶ 58     The manifest weight of the evidence in this case establishes that Prawdzik's psychological disability was caused, at least in part, by his work duties. Even when all reasonable inferences are drawn in the Board's favor, a conclusion opposite of that reached by the Board is clearly apparent.

¶ 59                                CONCLUSION

¶ 60     The judgment of the circuit court of Will County is reversed. The cause is remanded to the Board with instructions to award Prawdzik a line of duty disability pension.

¶ 61     Reversed; cause remanded.

¶ 62     JUSTICE SCHMIDT, dissenting:

¶ 63     I respectfully dissent. Plaintiff's service to this country, which undeniably came at a great personal loss, demands the respect of this court. However, I disagree with the majority's finding that a conclusion opposite that reached by the Board is clearly apparent. For that reason, I would affirm the Board's decision and find plaintiff is not entitled to a line of duty fireman's disability.

¶ 64     The record contains sufficient evidence to support the Board's finding that neither plaintiff's general firefighting/EMS duties nor the November 7, 2014, incident were " 'causative factor[s] contributing to the claimant's disability.' " *Supra* ¶ 40 (quoting *Scepurek*, 2014 IL App (1st) 131066, ¶ 27). In fact, the record shows that plaintiff's PTSD symptoms waxed and waned since he returned from combat. For example, in 2010 and 2011, plaintiff expressed concerns that his PTSD symptoms were causing problems with coworkers. In 2013, plaintiff's PTSD symptoms increased to the extent that he sought mental health treatment. As late as September 2014, plaintiff continued to complain of a depressed mood, nightmares, and flashbacks. In the weeks leading up to the November 7, 2014, incident, plaintiff reported experiencing increased anxiety. After the incident, claimant worked two more shifts without issue. He reported experiencing a "normal amount" of anxiety following the incident that slowly increased until he realized, on November 16, 2014, he could no longer focus on his job. Dr. Wasyliw attributed plaintiff's increased anxiety leading up to the incident to plaintiff's longstanding physical problems, new medications—which plaintiff stopped taking following the incident—and alcohol use. In January 2015, plaintiff reported having increased anxiety and panic attacks. In February 2015, he had a panic attack while driving his personal vehicle, and in July 2015, he had a panic attack while riding on a duck boat. Because there is sufficient evidence to support the Board's decision, I would defer to its finding that the November 7, 2014, incident, like others before and after, merely triggered symptoms of plaintiff's preexisting PTSD but that the incident did not causally contribute to his disability.

¶ 65     In closing, I note that the majority's analysis in this case could have far reaching detrimental consequences for our combat veterans. Specifically, the majority's decision may deter employers—at least police and fire departments—from hiring combat veterans if their general job duties might trigger some preexisting PTSD, which would entitle them to receive a line of duty disability pension.